**BROWNING–FERRIS INDUSTRIES OF SOUTH ATLANTIC, INC., a corporation; Browning–Ferris Industries, Inc., a corporation, Plaintiffs,**

v.

**WAKE COUNTY, Defendant.**

**Jonathan GARRITY d/b/a Cambridge–Hanover Aviation Parkway Associates, Plaintiff,**

v.

**WAKE COUNTY, Defendant.**

Nos. 5:94–CV–551–BR3, 5:94–CV–643–BR3.

United States District Court,
E.D. North Carolina,
Western Division.

Sept. 28, 1995.

Cecil W. Harrison, Jr., Robin T. Morris, Poyner & Spruill, Raleigh, NC, for plaintiffs.

Michael R. Ferrell, Wake County Attorney's Office, Raleigh, NC, for defendant.

## ORDER

BRITT, District Judge.

Plaintiffs, Jonathan Garrity d/b/a Cambridge–Hanover Aviation Parkway Associates ("Garrity"), Browning–Ferris Industries of South Atlantic, Inc. and Browning–Ferris Industries, Inc. (collectively "BFI"), filed actions against defendant, Wake County, North Carolina ("County"), alleging violations of both the federal and state constitutions, as well as asserting various state law claims. The dispute arises from plaintiffs' attempts to obtain sewer service for property located in Morrisville, North Carolina. Plaintiff Garrity purchased the subject property and sought to develop the property in order to lease it to BFI for use as a regional facility. Plaintiffs contend that defendant unlawfully frustrated plaintiffs' development plans. The two cases were consolidated by order dated 21 July 1995. The matter is now before the court on motions for summary judgment.

### I. FACTS

Garrity, in July 1992, purchased a 10.01 acre tract of undeveloped land in Morrisville, North Carolina. The tract is near Lake Crabtree, a Wake County recreational facility. Prior to purchasing the property, Garrity had entered into a lease agreement with

BFI pursuant to which Garrity was to lease the property to BFI. BFI is a company which provides contract sanitary services, including the collection, transportation and disposal of solid waste. On the premises it leased from Garrity, BFI planned to construct a regional facility ("proposed regional facility" or "PRF"). At the site, BFI intended to have office and storage space, and a place for washing and painting garbage trucks and containers.

Garrity and BFI developed a site plan for the PRF and submitted the plan to the Board of Commissioners of the Town of Morrisville. The Board of Commissioners approved the site plan in February 1992, and although approval of the plan was challenged by nearby property owners, the approval was ultimately upheld by the state courts. *See Garrity v. Morrisville Bd. of Adjustment*, 115 N.C.App. 273, 444 S.E.2d 653, *disc. rev. denied*, 337 N.C. 692, 448 S.E.2d 523 (1994). Plaintiffs consulted Wake County officials in order to learn exactly what permits and approvals would have to be obtained from the County. In response to this inquiry, Mike Aull, the County Projects Officer, stated that the County Engineering Office had concerns about the possible degradation of the water quality at Lake Crabtree because of the location of the PRF near the lake. Aull did, however, confirm that a land disturbing permit was the only permit required of the County. (Aull Dep. at 43–44.)

The County's fears regarding the impact the PRF might have on the water quality of Lake Crabtree centered on storm water runoff. In response to these concerns, plaintiffs implemented numerous changes with respect to the design plans for the PRF, most notably a retention basin for storm water runoff. (Def.Ex. 39.) Following the institution of these various design changes, the County issued a land disturbing permit for the PRF. (BFI Ex. 44.)

With respect to sewer service for the PRF, it was anticipated that effluent from the facility would be treated at a wastewater treatment plant owned by the Town of Cary. The effluent would be sent to the Cary treatment facility via a gravity sewer line owned by Wake County, commonly referred to as the Brier Creek Interceptor ("interceptor"). By agreement dated 3 November 1986, the Town of Cary had agreed to treat the wastewater of Morrisville residents by connections to the Brier Creek Interceptor. (BFI Ex. 8.1.) Plaintiffs were told that the Town of Cary would have to approve the connection to the Town of Cary sanitary sewer system, and the process for obtaining such approval was presented to plaintiffs on 12 February 1992 by way of letter from Douglas Spell, Cary's Town Engineer. (BFI Ex. 41.) Mr. Spell's letter did not reference a requirement of County approval for the connection. (*Id.*) The Cary Town Manager, James Westbrook, notified the Town of Morrisville of Cary's approval of BFI's connection to the Cary sewer system on 14 June 1993. (BFI Ex. 2.) On 13 October 1993, the Town of Morrisville issued a building permit for the PRF. (Essick Dep. Vol. I at 17.)

In order to send effluent through the Brier Creek Interceptor, a sewer line would have to be run across an adjacent piece of property. All parties initially believed that the adjacent property between the Garrity tract and the interceptor was owned by Wake County. Thus, plaintiffs sought the County's permission to run a sewer line from the PRF to the interceptor. This matter was placed on the Wake County Board of Commissioners' agenda for its 25 October 1993 meeting.

It was thereafter discovered that the County did not, in fact, own the property adjacent to the Garrity tract, but rather, held only a non-exclusive easement with respect to the property. Accordingly, the Town of Morrisville withdrew the request for an encroachment agreement with the County. (BFI Ex. 28.) Plaintiffs obtained an easement from the adjacent property owner, Bobby L. Murray, so that a sewer line could be run to the Brier Creek Interceptor.

At its 25 October 1993 meeting, the Wake County Board of Commissioners discussed the suitability of the PRF near the environs of Lake Crabtree. The Board voted to request a delay in commencement of construction of the PRF. (10/25/93 Meeting Tr. at 15–16.) The Board also directed the County Attorney to determine whether Garrity's property could be condemned for the benefit

of Wake County and voted to hold a public hearing on 1 November 1993 on the question of whether the County should adopt a resolution recommending that the North Carolina Division of Environmental Management ("DEM") not issue a National Pollutant Discharge Elimination System ("NPDES") permit[1] with respect to the subject development project. The Board was concerned about storm water runoff from the site polluting nearby Lake Crabtree and purportedly was inclined to take any action necessary to ensure that the PRF was not built on the Garrity tract.

At the 1 November 1993 meeting, the Board voted to adopt a resolution urging the DEM not to issue an NPDES permit for the site. The Commissioners also voted to adopt a resolution informing the Town of Cary that the County took the position that a 1983 agreement entered into between the two political subdivisions ("Western Wake Agreement") gave the County the right to approve sewage flowing through the Brier Creek Interceptor to the Cary treatment plant, and that the County would exercise its power to deny plaintiffs access to the interceptor. The Commissioners voted unanimously to deny BFI access to the interceptor. Subsequently, on 15 November 1993, the Board adopted a resolution notifying the Town of Cary that the County would deny a request to allow BFI access to the interceptor.

Following the County's 1 November 1993 resolution, BFI terminated its contractual relationship with Garrity. Thereafter, BFI brought an action against the County, alleging that the County's actions violated BFI's equal protection and substantive due process rights under the federal constitution, as well as state constitutional and common law rights. Garrity similarly initiated suit, alleging that the County's actions violated his substantive due process rights under the federal constitution, and his rights under the "law of the land" clause of the state constitution. Garrity also asserted a cause of action for tortious interference with a contractual relation. Defendant has moved for summary

judgment against both plaintiffs on the grounds that defendant took no action which prevented plaintiffs from developing the site, and that plaintiffs had no constitutionally protected property right to develop the tract so as to support a substantive due process claim. Additionally, plaintiff BFI has moved for partial summary judgment with respect to its federal equal protection and substantive due process claims.

## II. *DISCUSSION*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n. 4, 106 S.Ct. 2548, 2552 n. 4, 91 L.Ed.2d 265 (1986). The party moving for summary judgment has the initial burden of demonstrating the absence of any material issue of fact, but need not support its motion with affidavits or other materials negating the non-moving party's claim. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. Once the moving party meets its initial burden, the non-moving party may not rely upon mere allegations or denials contained in its pleadings, but must come forward with some form of evidentiary material allowed by Rule 56 demonstrating the existence of a genuine issue of material fact requiring a trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. In other words, to withstand a motion for summary judgment, the non-moving party must proffer sufficient evidence on which a reasonable jury could find in its favor. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. In considering the motion, the court must view the facts and inferences to be drawn from the evidence in the light most favorable to the non-moving party to the extent those inferences are reasonable. *Matsushita Elec-*

---

1. The NPDES permit would govern storm water runoff from the facility and its issuance was a prerequisite to operation of the PRF. The Division of Environmental Management of the De-

partment of Environment, Health and Natural Resources ("DEHNR") is the agency responsible for issuing NPDES permits in North Carolina.

*trical Industrial Company, Ltd. v. Zenith Radio Corporation,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ Before addressing the merits of plaintiffs' claims, the court must consider defendant's assertion that N.C.Gen.Stat. § 153A–283 (1991) precludes County liability in these suits. The statute at issue provides that "[i]n no case may a county be held liable for damages for failure to furnish water or sewer services." N.C.Gen.Stat. § 153A–283. The North Carolina Supreme Court has relied on the statute in holding that water service provided by a county does not constitute "property" for due process purposes. *McNeill v. Harnett County,* 327 N.C. 552, 571, 398 S.E.2d 475, 486 (1990). On the strength of N.C.Gen.Stat. § 153A–283 and *McNeill,* defendant contends that it cannot be held liable for plaintiffs' inability to secure access to sewer service.

■ The court disagrees with defendant's reading of the quoted statute and *McNeill* as they relate to plaintiffs' claims. First, the statute is inapplicable because plaintiffs did not seek sewer services from the *County.* The sewer service was to be provided by the Town of Cary; all plaintiffs sought from defendant was access to a County-owned interceptor. Moreover, a state statute cannot operate to inhibit a plaintiff's right to avail himself of the benefit of a federal statutory provision. *Murphy v. City of Flagler Beach,* 846 F.2d 1306, 1308 (11th Cir.1988); *Hankins v. Finnel,* 759 F.Supp. 569, 573 (W.D.Mo.1991). Additionally, the holding in *McNeill* in no way shelters defendant from liability in these actions. The court will proceed to address the merits of plaintiffs' claims and the pending summary judgment motions.

### A. *Substantive Due Process Claims*

In order for plaintiffs to prevail on their substantive due process claims, they must show (1) that they had a protected property right, and (2) that defendant arbitrarily or capriciously deprived them of that right. *Scott v. Greenville Co.,* 716 F.2d 1409 (4th Cir.1983). The asserted property interest in the present case is the opportunity to follow through with development of the PRF. The arbitrary or capricious action attributed to defendant is the County's assertion of a right to deny plaintiffs access to the Brier Creek Interceptor.

### 1. *Property Interest*

■ The first issue with respect to plaintiffs' due process claims is whether plaintiffs had a protected property interest in the development of the PRF. The question of whether a plaintiff possesses a property right is governed by state law. *Biser v. Town of Bel Air,* 991 F.2d 100, 103–04 (4th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993). To have a property interest in a certain benefit, it is clear that a person or entity must have more than an abstract need or desire for it. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Biser,* 991 F.2d at 104. Rather, there must be a legitimate claim of entitlement to the benefit in order for a property right to be involved. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709; *Biser,* 991 F.2d at 104. Plaintiffs assert that they had vested property rights under both North Carolina statutory and common law.

■ Plaintiffs first assert that a property right was at stake by virtue of the issuance of a valid building permit, citing N.C.Gen. Stat. § 160A–385(b) (1994). That statute provides as follows:

> Amendments, modifications, supplements, repeal or other changes in zoning regulations and restrictions and zone boundaries shall not be applicable or enforceable without consent of the owner with regard to buildings and uses for which either (i) building permits have been issued pursuant to G.S. 160A–417 prior to the enactment of the ordinance making the change or changes so long as the permits remain valid and unexpired pursuant to G.S. 160A–418 and unrevoked pursuant to G.S. 160A–422 or (ii) a vested right has been established pursuant to G.S. 160A–385.1 and such vested right remains valid and unexpired pursuant to G.S. 160A–385.1.

N.C.Gen.Stat. § 160A–385.1(c) deals with the establishment of a vested right. The subsection reads, in pertinent part:

A vested right shall be deemed established with respect to any property upon the valid approval, or conditional approval, of a site specific development plan, following notice and public hearing by the city with jurisdiction over the property. Such vested right shall confer upon the landowner the right to undertake and complete the development and use of said property under the terms and conditions of the site specific development plan or the phased development plan upon such terms and conditions as may reasonably be necessary to protect the public health, safety, and welfare. Such conditional approval shall result in a vested right, although failure to abide by such terms and conditions will result in a forfeiture of vested rights.

It is undisputed that the Town of Morrisville had issued a building permit for the PRF on 13 October 1993 and that the permit had not expired or been revoked as of 1 November 1993, when the Wake County Board of Commissioners voted to deny BFI access to the Brier Creek Interceptor. Defendant argues that N.C.Gen.Stat. § 160A–385(b) is inapplicable because the statute only applies to municipal governments and because the County's disputed actions were not undertaken pursuant to its zoning power.

The court is of opinion that plaintiffs acquired vested rights under the quoted statutes by virtue of the issuance of the building permit by the Town of Morrisville. Although the referenced statutes are not entirely directed to situations such as presented in these cases, they are instructive on the question of whether plaintiffs obtained rights which the North Carolina General Assembly prohibited interference with by subsequent governmental action.

 Additionally, a party may acquire a vested right if it, in good faith, has made a substantial beginning towards the party's intended use of the land. *Simpson v. City of Charlotte*, 115 N.C.App. 51, 443 S.E.2d 772 (1994) (*citing Sunderhaus v. Board of Adjustment of Town of Biltmore Forest*, 94 N.C.App. 324, 326, 380 S.E.2d 132, 133

(1989)). The North Carolina Supreme Court has stated:

[O]ne who, in good faith and in reliance upon a permit lawfully issued to him, makes expenditures or incurs contractual obligations, substantial in amount, incidental to or as part of the acquisition of the building site or the construction or equipment of the proposed building for the proposed use authorized by the permit, may not be deprived of his right to continue such construction and use by the revocation of such permit, whether the revocation be by the enactment of an otherwise valid zoning ordinance or by other means, and this is true irrespective of the fact that such expenditures and actions by the holder of the permit do not result in any visible change in condition of the land.

*Town of Hillsborough v. Smith*, 276 N.C. 48, 55, 170 S.E.2d 904, 909 (1969). The inquiry as to whether a party has acquired a vested property right under the common law of North Carolina centers on the party's reliance on a permit, the exercise of good faith, and the incurring of substantial expenditures prior to the revocation of a permit or the amendment to an ordinance. *Simpson*, 115 N.C.App. at 58, 443 S.E.2d at 777 (*citing Godfrey v. Zoning Bd. of Adjustment*, 317 N.C. 51, 63, 344 S.E.2d 272, 279 (1986)).

 In the instant case, it is undisputed that plaintiffs had developed a site plan for the PRF, had expended substantial amounts of effort and money toward developing the site, and had been issued a building permit by the Town of Morrisville. Defendant contends that since plaintiffs never obtained NPDES land disturbing or operating permits no property rights had vested. Plaintiffs counter that they were ready to pursue the necessary NPDES permits but did not do so because the County had made clear that it would deny BFI access to the Brier Creek Interceptor. Thus, plaintiffs allege, any efforts to obtain permits from the State would have been futile if the County was determined to block their development efforts. Moreover, plaintiffs contend that defendant should be estopped from asserting this argument as it was *defendant's* actions which

prevented plaintiffs from securing all necessary permits.

Defendant also contends that the building permit issued by the Town of Morrisville for the PRF was conditional in nature. As to plaintiffs' expenditure in reliance on the site plan approval, defendant contends that the sum is only approximately $15,000.00, rather than the hundreds of thousands of dollars alleged.

Despite these purported shortcomings, the court is of opinion that plaintiffs have demonstrated that their rights to develop the PRF had vested under applicable North Carolina law. Regardless of whether G.S. § 160A–385(b) and § 160A–385.1 are applicable in this situation, the court is convinced that, under North Carolina common law, plaintiffs' rights to develop the subject tract had vested. Plaintiffs incurred substantial expenditures in reliance on the site plan approval and the issuance of the building permit. Plaintiffs' efforts following the site plan approval were undertaken in good faith and under reasonable reliance on the validity of the approvals they had been granted. It is of no consequence that the building permit was conditional in nature and that plaintiffs had not secured an NPDES permit for the site. As of 1 November 1993, plaintiffs had made a substantial beginning toward the completion of their project and had a valid building permit which would allow them to commence construction. Nor were plaintiffs required to pursue more costly or less convenient alternatives for securing sewer service for the facility that may or may not have been available to them.

### 2. Arbitrary or Capricious Action

■■■. Governmental action in the zoning or land use context violates due process principles if it is arbitrary or capricious, lacks a rational basis, or is undertaken with improper motives. *Walz v. Town of Smithtown,* 46 F.3d 162 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2557, 132 L.Ed.2d 810 (1995) (improper motive); *Marks v. City of Chesapeake, Va.,* 883 F.2d 308 (4th Cir.1989) (improper motive); *Bello v. Walker,* 840 F.2d 1124 (3rd Cir.), *cert. denied,* 488 U.S. 851, 109 S.Ct. 134, 102 L.Ed.2d 107 (1988) (im-

proper motive); *Scott v. Greenville County,* 716 F.2d 1409 (4th Cir.1983) (arbitrariness); *Dale v. City of Morganton,* 270 N.C. 567, 572, 155 S.E.2d 136, 141 (1967) (improper motive). Plaintiffs contend that the County's actions were violative of the due process clause for the following reasons: (1) the County denied BFI access to the Brier Creek Interceptor for reasons wholly unrelated to BFI's expected use of the interceptor; (2) the County had no standards in place for the approval or denial of requests to access the interceptor; and (3) no other landowner had been denied access to the interceptor or even been required to seek County approval incident to accessing the sewer system. Defendant counters that the Wake County Board of Commissioners denied access to the Brier Creek Interceptor because of genuine concern about the welfare of nearby Lake Crabtree. Defendant asserts that this legitimate objective insulates it from plaintiffs' due process challenge. The court does not agree.

The Wake County Board of Commissioners, on 1 November 1993, voted to deny BFI access to the Brier Creek Interceptor. At that meeting, the Board entertained public comments from individuals concerning the location of the PRF near Lake Crabtree. All of the individuals who spoke at the meeting, aside from those associated with BFI, opposed allowing the PRF to be built at that location. The County Attorney, Michael Ferrell, presented to the Board his interpretation of the Western Wake Agreement. (11/1/93 Meeting Tr. at 4–7.) As the meeting progressed, it became apparent that the Commissioners were opposed to the building of the PRF in the proximity of Lake Crabtree. The efforts of those representing BFI to assuage the Commissioners' fears proved fruitless. Commissioner Jones, in discussing how to block plaintiffs' plans, stated:

> ... From what I've heard last week and what I've managed to pick up from telephone conversations to me by people who oppose it, *I have a definite leaning to do whatever it takes to try to stop this from happening.*

(*Id.* at 37.) Commissioner Adcock then addressed Mr. Jim Robbins, the contractor for

the PRF who had previously told the Board about the environmental safeguards that had been implemented with respect to the facility, stating:

Mr. Robbins, I think you have an excellent site plan. There's nothing wrong with the site plan in my opinion. It's just in the wrong place. It's a wonderful site plan.

(*Id.* at 39.) Mr. Adcock later confirmed, during his deposition testimony, that he simply did not want the PRF to be situated near Lake Crabtree. (Adcock Dep. at 22.) Commissioner Ward, at the 1 November 1993 meeting, echoed Adcock's sentiments:

I just wanted to make a comment before we finish this. I wanted to say, as I said last week, that while no one doubts the integrity of BFI as a corporate entity in this community, and we very much all understand that solid waste disposal is a very important part of how we, as a society, deal with what it is that we have, and that you do an excellent job, and I'm sure that you're environmentally concerned, my concern has been and still is the site selection, and that has to do with on the shores of Lake Crabtree, because I think that we have a responsibility to protect that lake. And I appreciate all the information that was given, but I still—I have a real problem with it.

(11/1/93 Meeting Tr. at 43.) The tenor of all the comments of the Commissioners and of the citizens opposed to the location of the PRF was that the facility was not a suitable one to be located near a county recreational facility.

The evidence of record shows that the overriding, if not the only, concern the Wake County Board of Commissioners had with respect to the PRF was its location near Lake Crabtree. The Commissioners apparently had no problem with the PRF itself, merely its location near the lake. The court finds that the location of the PRF was not a matter rightfully within the Board's purview and that its concerns about the facility's storm water runoff was an issue best left to the responsible state regulatory agency. The County had no authority to regulate land use within the geographical confines of the Town of Morrisville. *See* N.C.Gen.Stat.

§ 160A–381 (1994) (limiting county authority to issue ordinances to those parts of a county not within a city); *Davidson County v. City of High Point,* 321 N.C. 252, 362 S.E.2d 553 (1987) ("A county ... may not exercise jurisdiction over any part of a city located within its borders.") (citations omitted). In addition to having no jurisdiction over the tract of land on which the PRF was to be built, the County's reason for denying access to the interceptor implicated a matter that is heavily regulated by the State of North Carolina. The County's concern centered on the possibility that storm water runoff from the PRF might degrade the waters of Lake Crabtree. Although this might have been a legitimate concern, the matter is one which falls under the jurisdiction of the DEHNR. Some of the Commissioners themselves questioned why the Board was concerning itself with the project. (10/25/93 Meeting Tr. at 2–3.) Additionally, Commissioner Jones, at his deposition, conceded that the County did not have jurisdiction over the question of whether the PRF could be located where plaintiffs sought to construct it, nor over the storm water runoff issue. (Jones Dep at 31.) Jones admitted that the County's ownership of the Brier Creek Interceptor was the only leverage the County had *vis a vis* BFI. (*Id.*)

It is apparent that the Wake County Commissioners were looking for any reason they could find to force the PRF to another location. The uncontroverted evidence of record reveals that the County seized upon its newly discovered "authority" to deny access to the interceptor as a means of frustrating plaintiffs' efforts to build the PRF on the Garrity tract. This conclusion is irrefutable since the public testimony and the comments of the Commissioners focused on the danger that storm water runoff from the PRF might defile the waters of Lake Crabtree, and the Board's resolution addressed access to an interceptor which would carry the facility's domestic wastewater to the Cary wastewater treatment plant. The County's action, dealing with domestic wastewater, was in no way related to the concern it faced, namely, storm water runoff from the PRF reaching Lake Crabtree.

The court's conclusion that the County denied access to the Brier Creek Interceptor based on improper motives is further supported by the fact that access was denied for a reason wholly unrelated to the effluent that would actually pass through the interceptor. Other courts have soundly held that the denial of a benefit for an unrelated reason constitutes a violation of due process principles. *Walz*, 46 F.3d at 169 (demand that property owner deed land to town for widening of street in exchange for connection to public water supply violated due process rights of property owner); *Bello*, 840 F.2d at 1129–30 (interference with permitting process by council members "for partisan political or personal reasons unrelated to the merits of the application for the permits" is violative of due process principles); *Dale*, 270 N.C. at 572–73, 155 S.E.2d at 141 (city could not deprive individual of utility service because of unrelated dispute with individual). A thorough review of the evidence of record leads the court to the inescapable conclusion that defendant denied BFI access to the Brier Creek Interceptor for the sole reason that defendant did not want plaintiffs to proceed with their plans to construct the PRF on the Garrity tract. The reason for the denial of access had nothing to do with the effluent from the BFI facility that was to be sent through the interceptor. The County had already issued the one permit over which it had issuing authority, the land disturbing permit.

The court's conclusion is buttressed by the fact that the County had never before stated to plaintiffs or to any other individual, prior to the fall of 1993, that the County had the authority to approve sewage flowing through the Brier Creek Interceptor pursuant to the terms of the 1983 Western Wake Agreement. (Essick Aff. at 1–2; Aull Dep. at 23–32.) It appears that the County Attorney, following the 25 October 1993 Board of Commissioners' meeting at which the Commissioners first publicly voiced their opposition to the location of the BFI facility, searched for a means to halt construction of the PRF, and presented the option of asserting the County's rights under the Western Wake Agreement as one way of achieving that objective. The Commissioners, who were opposed to the PRF because of its proximity to Lake Crabtree, then voted to block the facility's use of the Brier Creek Interceptor for transportation of its domestic wastewater. The comments of Commissioner Ward seem to typify the mindsets of the other members of the Wake County Board of Commissioners. At her deposition, Ward confirmed that "in adopting the resolution, instructing the County to 'enforce' its rights under the Western Wake agreement," her intention was "to stop BFI from building the Morrisville site." (Ward Dep. at 18.)

█ There is also evidence that the Board's decision was motivated by public pressure from citizens opposed to the PRF being built near Lake Crabtree. Numerous persons spoke at the 1 November 1993 Board of Commissioners' meeting in opposition to allowing the PRF to built near Lake Crabtree. (11/1/93 Meeting Tr. at 9–21.) Opponents of the PRF voiced a common fear of injury to the environmental integrity of the Lake Crabtree area. Just as a benefit cannot be denied because of an improper motive or for a reason unrelated to the provision of the benefit, government actors cannot single out a particular individual or entity for disparate treatment based on illegitimate, political or personal motives. *Marks*, 883 F.2d at 313 (denial of permit for palmistry based on public outcry against business violated due process clause).

Regardless of the good intentions the Wake County Commissioners might have had in their efforts to ensure the vitality of Lake Crabtree, the fact remains that the body acted unlawfully in its pursuit of that objective. The County's actions were arbitrary and capricious, lacked a reasonable basis related to a legitimate governmental objective within the Board's jurisdiction, and were driven by improper motives. The court concludes that the County's actions contravened plaintiffs' rights to substantive due process under the Fourteenth Amendment to the United States Constitution. Accordingly, defendant's motion for summary judgment as to plaintiffs' substantive due process claims will be DENIED. BFI's motion for summary judgment as to liability on its due process claim will be GRANTED.

█ The court will also grant summary judgment in favor of Garrity on his due process claim even though he did not move for summary judgment. As the plaintiffs in these two consolidated cases are identically situated and suffered from the same wrongful conduct of defendant, both are entitled to judgment as a matter of law upon a finding that one is so entitled. It is of no import that Garrity did not move for summary judgment. *See Dayton Elec. Mfg. Co. v. AP-COM, Inc.,* 782 F.Supp. 389 (N.D.Ill.1992) (granting summary judgment in favor of non-movant plaintiff in face of summary judgment motion by defendant). The grant of summary judgment in favor of the non-movant, plaintiff Garrity, is particularly appropriate here since an identically situated party, BFI, did, in fact, move for summary judgment. Given BFI's motion for summary judgment and the voluminous submissions by all parties, defendant cannot be heard to complain of lack of notice or unfairness with respect to the entry of judgment against it. Thus, in the interests of judicial economy and fundamental fairness, summary judgment in favor of Garrity will be GRANTED, as to liability, on his claim for deprivation of substantive due process.

### B. *Equal Protection Claim*

█ Plaintiff BFI asserts a claim for denial of equal protection. BFI contends that other similarly situated entities were permitted access to the Brier Creek Interceptor, while BFI was subjected to disparate treatment. To prevail on its equal protection claim, BFI must demonstrate that it was treated differently than a similarly situated entity, and that the disparate treatment was not rationally related to a legitimate governmental interest of Wake County. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

BFI contends that two other similarly situated entities, Southport Business Park ("Southport") and Commonwealth Centre ("Commonwealth"), were allowed to connect to the Brier Creek Interceptor without undergoing the exacting scrutiny to which BFI was subjected. This assertion appears to be true based on the deposition testimony of Michael Aull confirming that, prior to BFI's attempts to tap into the Brier Creek Interceptor, the County had not taken steps to either approve or disapprove connections to the interceptor. (Aull Dep. at 39–40.) However, Aull stated that he was not aware that Southport had connected to the interceptor, leaving only one other entity with which BFI could compare itself. (*Id.*)

The court notes several deficiencies with respect to BFI's equal protection claim. As an initial matter, it is unclear exactly which law BFI contends has been unequally applied. BFI has directed the court to no cases in which a plaintiff was permitted to proceed with an equal protection challenge absent the existence of some permitting scheme or ordinance which could be applied unequally. The record reveals that the County previously was unaware of its "authority" to approve connections to the Brier Creek Interceptor. Indeed, the County had never asserted this "authority" before plaintiffs' attempts to access the Brier Creek Interceptor. Thus, it would seem incongruous to find that a law was applied unequally when the County admits that BFI was the first entity which the County believed could be denied access to the interceptor.

Assuming, without deciding, that BFI can mount an equal protection challenge under these facts, the court finds that the claim fails on the merits. Although it is clear that BFI was subjected to different treatment than at least one other business located near Lake Crabtree, the court finds that the entities are not similarly situated. There is no evidence that any other business was allowed access to the Brier Creek Interceptor which, at least arguably, posed the risk of environmental harm to the surrounding area as did the PRF. Assuming, *arguendo,* that another entity was similarly situated to BFI, the court finds that the more exacting scrutiny applied to BFI was rationally related to a legitimate governmental objective, that being the preservation of a county recreational area.

In sum, the court is of opinion that BFI has not been denied equal protection rights by defendant and that defendant's motion for

summary judgment as to this claim will be GRANTED.

### C. *"Law of the Land Clause" Claims*

 Article I, Section 19 of the North Carolina Constitution, commonly referred to as the "law of the land" clause provides that:

> No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land. No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin.

The "law of the land" clause incorporates both federal due process and equal protection principles. *In re Moore,* 289 N.C. 95, 221 S.E.2d 307 (1976); *S.S. Kresge Co. v. Davis,* 277 N.C. 654, 178 S.E.2d 382 (1971). Plaintiffs' contentions and defendant's arguments with respect to the "law of the land" claims mirror that which was presented in the analysis dealing with the federal substantive due process claims and need not be repeated here. Because plaintiffs have demonstrated that they were denied substantive due process rights by defendant, they are also entitled to judgment on their respective "law of the land" clause claims. Accordingly, defendant's motion for summary judgment with respect to those claims will be DENIED, and judgment will be GRANTED, as to liability, in favor of plaintiffs on those claims. Again, defendant cannot be heard to complain of a lack of notice since, in submitting its motion for summary judgment as to these claims, it has represented to the court that there are no genuine material questions of fact existent and that it is prepared to have the court enter judgment based on the applicable law. *See Dayton Elec.,* 782 F.Supp. at 395 (risk of unfairness and procedural prejudice lessened "when the court grants, *sua sponte,* summary judgment on issues that are the same as those presented in a party-filed motion for summary judgment").

### D. *State Common Law Claims*

Plaintiff Garrity asserts a state-law claim for interference with a contractual relation. Garrity contends that his contractual relation with BFI was unlawfully interfered with by defendant. Randall Essick[2] stated in his deposition that BFI decided to search for a new site for the PRF due to the County's efforts to frustrate BFI's plans to construct the PRF on the Garrity tract. (Essick Dep. Vol. II at 7.) Defendant answers that Garrity's claim is barred by G.S. § 153A–283 and various technical infirmities with respect to the cause of action. In addition, defendant asserts that the existence of a valid justification for seeking to frustrate plaintiffs' development plans defeats Garrity's claim.

 The elements of a claim of tortious interference with a contractual relation are as follows: (1) the existence of a valid contract between plaintiff and a third party; (2) knowledge by defendant of that contract; (3) acts by defendant to intentionally induce the third party not to perform the contract; (4) defendant's acts committed without justification; and (5) actual damage resulting to plaintiff. *Embree Construction Group v. Rafcor, Inc.,* 330 N.C. 487, 411 S.E.2d 916 (1992). Defendant focuses its attack relating to this claim on the first and fourth elements.

 First, defendant asserts that no valid contract existed between Garrity and BFI during the relevant time period. Defendant further contends that if a valid lease agreement ever existed between Garrity and BFI, the agreement expired by its own terms prior to any action taken by the County that would have hindered plaintiffs' development plans.[3] Defendant also asserts that it was justified in interfering with plaintiffs' contractual relation.

---

**2.** Randall Essick is Divisional Vice President/Eastern North Carolina for Browning–Ferris Industries of South Atlantic, Inc. and was intimately familiar with plaintiffs' development plans at the Garrity tract.

**3.** Defendant's assertion that Garrity could not pursue this claim for the reason that the lease agreement was executed on behalf of Cambridge–Hanover, Inc., not Garrity, is entirely correct. However, this deficiency has been corrected by means of amendment of Garrity's complaint.

With respect to the defense of justification in this context, the North Carolina Supreme Court has stated:

> One is privileged purposely to cause another not to perform a contract, or enter into a business relation, with a third party by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction.

*Kelly v. International Harvester Co.,* 278 N.C. 153, 165, 179 S.E.2d 396, 402 (1971). Relevant factors to be considered in determining whether a defendant may avail himself of a defense of justification are the defendant's motive, the interests sought to be furthered, and the contractual interest of the other party. *Peoples Security Life Ins. Co. v. Hooks,* 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988).

As genuine issues of material fact exist concerning these factors, the court finds that Garrity's claim for interference with a contractual relation is not amenable to resolution by summary judgment. Accordingly, defendant's motion for summary judgment as to that claim will be DENIED. Defendant's motion for summary judgment as to BFI's state law claims will also be DENIED.

### III. *CONCLUSION*

In conclusion, plaintiffs are entitled to judgment as a matter of law on the issue of liability with respect to their claims against defendant for deprivation of substantive due process under both the federal and state constitutions. Accordingly, plaintiff BFI's motion for summary judgment, as to liability, on its substantive due process claim will be GRANTED. Judgment will also be entered in favor of plaintiff Garrity, as to liability, with respect to his substantive due process claim. Plaintiff BFI has not demonstrated that it was denied rights under the equal protection clause, and accordingly, BFI's motion for summary judgment as to that claim will be DENIED, and defendant's GRANTED. Defendant's motion for summary judgment as to the remainder of plaintiffs' state-law claims will be DENIED. The action will stand for trial on those claims and for a determination of plaintiffs' damages relating to their federal and state due process claims.

SO ORDERED.