MLC AUTOMOTIVE, LLC; AND LEITH OF FAYETTEVILLE, INC., PLAINTIFFS v. TOWN OF
SOUTHERN PINES; THE SOUTHERN PINES TOWN COUNCIL; AND FRANK QUIS,
DAVID WOODRUFF, FRED WALDEN, CHRISTOPHER SMITHSON AND MICHAEL
HANEY, DEFENDANTS

No. COA09-433 ·

(Filed 2 November 2010)

**1. Zoning— rezoning—auto park—common law vested right—
failure to show substantial expenditures in good faith
reliance on governmental approval**

The trial court erred in a zoning case by granting summary
judgment in favor of plaintiffs on their claim of a common law
vested right to develop an auto park notwithstanding the rezon-
ing of the pertinent property. Plaintiffs did not make substantial
expenditures in good faith reliance on governmental approval of
their proposed automobile dealership project. The case was
remanded for entry of summary judgment in favor of defendants.

**2. Zoning— rezoning—tortious interference with contract—
tortious interference with prospective economic gain—fail-
ure to show lack of justification**

The trial court did not err in a zoning case by granting sum-
mary judgment in favor of defendants on plaintiffs' claims for tor-
tious interference with contract and tortious interference with
prospective economic advantage. Plaintiffs failed to present any
evidence that defendants acted without justification in rezoning
the property in accordance with its statutory authority.

Appeal by plaintiffs and defendants from order entered 12
November 2008 by Judge James M. Webb in Moore County Superior
Court. Heard in the Court of Appeals 28 October 2009.

*Poyner Spruill, LLP, by Cecil W. Harrison, Jr. and Chad W.
Essick; and Currin & Currin, by Robin Tatum Currin, for
plaintiffs.*

*Cranfill Sumner & Hartzog LLP, by Susan K. Burkhart, for
defendants.*

GEER, Judge.

This appeal arises out of a zoning dispute between plaintiffs, Leith of Fayetteville, Inc. and MLC Automotive, LLC, and defendants, the Town of Southern Pines ("the Town"), the Southern Pines Town Council, and individual Council members (Frank Quis, David Woodruff, Fred Walden, Christopher Smithson, and Michael Haney). Plaintiffs purchased a parcel of land in the Town and made initial preparations to develop it for use as an auto park, a use permitted in the zoning classification that applied to the property at the time of plaintiffs' purchase. After plaintiffs began the process to obtain the required permits, the Town rezoned the property—the new classification no longer permitted motor vehicle sales.

Plaintiffs sued defendants for tortious interference with contract and tortious interference with prospective economic advantage. They also claimed to have a common law vested right to develop the auto park on the property. The trial court granted summary judgment to defendants on plaintiffs' tort claims, but granted summary judgment to plaintiffs on the common law vested right claim. Both sides appealed.

We affirm the trial court's grant of summary judgment to defendants on the tort claims. Plaintiffs failed to present any evidence that defendants acted without justification in rezoning the property—an essential element of both tort claims. We, however, reverse the trial court's grant of summary judgment to plaintiffs on their claim of a common law vested right since plaintiffs did not make substantial. expenditures in good faith reliance on government approval of their proposed automobile dealership project.

Facts

In 2000, plaintiffs, who are in the business of developing and operating automobile dealerships, became interested in purchasing a 21-acre tract of land near the intersection of U.S. Highway 1 and N.C. Highway 2 in the Town of Southern Pines, North Carolina. Plaintiffs intended to develop an auto park consisting of several dealerships. This property was zoned General Business ("GB"), and, at the time, the Town's Unified Development Ordinance ("UDO") provided that property in districts zoned as GB could be used for "Motor Vehicle and Boat Sales or Rental or Sales and Service" without a special or conditional use permit.

On 28 June 2001, the Code Enforcement Officer for the Town sent a letter to Jim Murray, a resident of Pinehurst, explaining that a car dealership can be located in the GB district so long as all zoning requirements are met. On 30 November 2001, the Code Enforcement Officer

responded to an inquiry by Danny Howell of Raleigh, acknowledging that the property at issue in this case was located in the GB zoning district, and automobile sales were a permitted use in the GB district.

Plaintiffs purchased the property for $1,553,904.00 in January 2002. Between 2001 and 2005, plaintiffs spent an additional $518,156.00 in preparations to develop the property. In January 2005, plaintiffs entered into a letter of intent ("LOI") with American Suzuki Motor Corporation ("Suzuki"). Pursuant to the LOI, plaintiffs agreed to construct an automobile sales, service, and parts facility on the property in accordance with the agreed upon terms and conditions set out in the LOI. In exchange, upon completion of the facility, Suzuki agreed to issue plaintiffs a Dealership Agreement for one year.

Plaintiffs hired William G. Daniel & Associates, P.A. to perform site design services for the property, which included investigating the regulatory requirements pertaining to construction of the auto park. In January 2005, Daniel met with Bart Nuckols, the Town Planning Director, to discuss the plans for the auto park. At this meeting, Nuckols explained to Daniel that under the UDO, in order to proceed with the development of the property, plaintiffs needed a zoning/building permit. Nuckols told Daniel that the Town's zoning permit and building permit procedure was a unitary procedure and that there was a checklist of items that had to be completed before an application for a zoning/building permit could be submitted and reviewed.

In support of their motion for summary judgment, defendants filed an affidavit by Nuckols stating that since at least 1990, "the Town has issued unitary zoning/building permits for proposed construction in the Town." According to Nuckols, the Town uses a "unified" or "combined" zoning/building permit, which "has a blank for indicating the appropriate zoning compliance and is signed by the Zoning Officer when the zoning is determined to be appropriate. The Town does not issue a separate permit to indicate zoning compliance."

Daniel testified that Nuckols told him that plaintiffs had to obtain an architectural compliance certificate from the Town Council before moving forward with the other steps on the checklist. Nuckols, however, in his deposition, denied making that statement.

On 17 March 2005, plaintiffs filed their architectural compliance permit application and, on 6 April 2005, appeared at the Town Council's agenda meeting to present the design. After hearing the presentation, members of the Town Council expressed their disapproval of the

design, arguing that the modern design did not fit with the Town's more traditional look. The Town Council indicated it would not approve an architectural compliance permit for the project as presented and directed plaintiffs to revise the design.

Plaintiffs modified the plans, and a new design was presented at the 8 June 2005 meeting. At that meeting, the Town Council acknowledged that plaintiffs had made design improvements. According to plaintiffs, they expected a favorable vote on the plans at the next meeting. At the 14 June 2005 meeting, one Town Council member moved for architectural approval of the plans, and another member seconded the motion. The Town Council then discussed concerns over proposed building materials and colors. Many Town residents spoke in opposition to the plans. At the end of the discussion, the Town Council voted to delay the vote until the next regular meeting.

Plaintiffs decided not to have the Town Council vote on the plans at the next meeting, but rather chose to take additional time to facilitate community discussions and attend a meeting with neighbors who were strongly opposed to the proposed plans. On 12 July 2005, the Town Council again reviewed the plans, which had been further revised. Plaintiffs again declined to have the Town Council vote on the plans, but stated they would come back to the next meeting with answers to specific questions raised by the Town Council.

On 22 and 29 July 2005, Robert Thompson, a local real estate attorney, submitted to the Town two different zoning amendment petitions supported by citizen signatures. The first petition sought to amend the UDO by reducing allowable impervious surfaces for development. The second petition sought to rezone plaintiffs' property so that it was no longer in a GB district, but rather was located in an Office Services ("OS") district. Thompson did not communicate with any Town staff or Town Council members regarding the petitions. The Town noticed the petitions for hearing in accordance with the UDO.

On 9 August 2005, at the next Town Council meeting, the Town Council received a letter from plaintiffs' attorney advising that if the Town Council did not approve the architectural plans, plaintiffs would file a lawsuit. At the meeting that evening, the Town Council postponed the scheduled vote on the plans because it said it needed time to review the letter threatening legal action sent by plaintiffs' attorney.

On 24 August 2005, the Town Planning Board heard public comments and recommended that the Town Council approve both rezon-

ing amendments. The Planning Board concluded that the existing GB zoning for plaintiffs' property was an "anomaly" because the tract was surrounded on three sides by residential neighborhoods, with forested conservation areas across the road from the tract, and that OS zoning would serve as a buffer or transition to the adjacent neighborhoods.

On 9 September 2005, Daniel submitted plaintiffs' application and plans for an erosion control permit. Daniel and plaintiffs' counsel also each sent a letter on that date to Nuckols, requesting that the Town treat the letters and accompanying site plans as an application for a "zoning permit." Daniel made this request because he believed that plaintiffs could not satisfy the checklist requirements for applying for a zoning/building permit, so he sought to make a distinction between a "zoning" permit and the zoning/building permit recognized by the Town. In response, Nuckols sent a letter stating: "We have received the materials developed by William G. Daniel & Associates, and will proceed in our normal manner. Attached are the instructions we provide to persons seeking building/zoning permits." The letter attached the checklist Nuckols had discussed with Daniel earlier.

On 13 September 2005, the Town Council approved plaintiffs' architectural plans for the Suzuki dealership. At that meeting, the Town Council also considered the proposed zoning amendments. The Council deferred voting on the proposed amendments until the next meeting on 11 October 2005.

On 4 October 2005, the Town denied plaintiffs' erosion control application. On 11 October 2005, at approximately 4:30 p.m., Daniel went to the Town's Public Works Department and attempted to submit an application for a water and sewer permit, a driveway permit, an encroachment agreement and various plans, including an erosion control plan identical to the one that had previously been denied. The plans were accepted, but the other documents were rejected pending review of the plans.

On the evening of 11 October 2005, the Town Council voted unanimously to rezone the property so that it was located in an OS district. The Public Works Department took no further action on the submitted plans because the rezoning prohibited the proposed use. The Suzuki LOI subsequently expired, and plaintiffs are unable to operate a Suzuki dealership on the property.

On 9 December 2005, plaintiffs brought suit against defendants in the United States District Court for the Middle District of North

MLC AUTO., LLC v. TOWN OF SOUTHERN PINES

[207 N.C. App. 555 (2010)]

Carolina. Plaintiffs asserted claims for (1) common law vested rights, (2) violation of federal substantive due process rights, (3) violation of state substantive due process rights, (4) tortious interference with contract, and (5) tortious interference with prospective economic advantage. The parties filed cross-motions for summary judgment. The district court entered an order abstaining from deciding the state law claims and staying the federal claims pending resolution of the land use and zoning issues in state court. Defendants appealed to the Fourth Circuit Court of Appeals, and on 3 July 2008, the Court affirmed. *MLC Automotive, LLC v. Town of Southern Pines*, 532 F.3d 269 (4th Cir. 2008).

On 18 October 2007, plaintiffs filed this action in Moore County Superior Court. Both parties again filed motions for summary judgment. On 12 November 2008, the trial court granted plaintiffs' motion for partial summary judgment on their claim for a common law vested right and granted defendants' motion for partial summary judgment on plaintiffs' claims for tortious interference with contract and prospective economic advantage. Both sides timely appealed to this Court.

## Defendants' Appeal

**[1]** Defendants appeal the trial court's grant of summary judgment to plaintiffs on their claim that they had a vested right to develop the property as an auto park notwithstanding the rezoning of the property. "The standard of review for summary judgment is de novo." *Forbis v. Neal*, 361 N.C. 519, 524, 649 S.E.2d 382, 385 (2007). " '[O]ur standard of review is (1) whether there is a genuine issue of material fact and (2) whether the movant is entitled to judgment as a matter of law.' " *McCoy v. Coker*, 174 N.C. App. 311, 313, 620 S.E.2d 691, 693 (2005) (quoting *NationsBank v. Parker*, 140 N.C. App. 106, 109, 535 S.E.2d 597, 599 (2000)). We view the evidence in the light most favorable to the non-movant. *Id.*

"As a general proposition '[t]he adoption of a zoning ordinance does not confer upon citizens . . . any vested rights to have the ordinance remain forever in force, inviolate and unchanged.' " *Browning-Ferris Indus. of South Atlantic, Inc. v. Guilford County Bd. of Adjustment*, 126 N.C. App. 168, 171, 484 S.E.2d 411, 414 (1997) (quoting *McKinney v. City of High Point*, 239 N.C. 232, 237, 79 S.E.2d 730, 734 (1954)). "North Carolina does, however, recognize two methods for a landowner to establish a vested right in a zoning ordinance: (1) qualify with relevant statutes . . .; or (2) qualify under the common law[.]" *Id.*

MLC AUTO., LLC v. TOWN OF SOUTHERN PINES

[207 N.C. App. 555 (2010)]

In this case, plaintiffs have claimed only a vested right arising under the common law. "A party claiming a common law vested right in a nonconforming use of land must show: (1) substantial expenditures; (2) in good faith reliance; (3) on valid governmental approval; (4) resulting in the party's detriment." *Kirkpatrick v. Village Council for the Village of Pinehurst*, 138 N.C. App. 79, 87, 530 S.E.2d 338, 343 (2000). The disputes on appeal are whether plaintiffs acted in reliance on the required "valid governmental approval" and whether plaintiffs made substantial expenditures in reliance on that approval.

Plaintiffs first contend that existing zoning is sufficient governmental approval to give rise to a vested right when a landowner makes substantial expenditures based on that existing zoning. Under their view, because the property was zoned GB and an automobile dealership was a permitted use, they acquired a common law vested right to develop their automobile dealership when they expended sums in reliance on that zoning.

Plaintiffs, in support of their motion for summary judgment, submitted an affidavit from Linda J. Leith, the Manager of MLC and Vice President of Leith. She stated multiple times in that affidavit that Leith acquired the property "[i]n good faith reliance upon the fact that the Property was zoned GB and that automobile dealerships were a permitted use of the Property, as confirmed repeatedly by the Town . . . ." She represented that "Leith would never have purchased the Property, nor incurred any of the other expenses described in this Affidavit, if the Property had not been zoned GB where automobile dealerships were a permitted use."

Our Supreme Court has, however, expressly rejected this contention: "[O]ne does not acquire a vested right to build, contrary to the provisions of a subsequently enacted zoning ordinance, by the mere purchase of land in good faith with the intent of so building thereon . . . ." *Town of Hillsborough v. Smith*, 276 N.C. 48, 55, 170 S.E.2d 904, 909 (1969). In other words, the fact that plaintiffs purchased the property in good faith reliance on the GB zoning is not sufficient to give rise to a vested right.

Instead, *Town of Hillsborough* set forth the following test for the existence of a common law vested right:

>  We, therefore, hold that *one who, in good faith and in reliance upon a permit lawfully issued to him,* makes expenditures or incurs contractual obligations, substantial in amount, incidental to

or as part of the acquisition of the building site or the construction or equipment of the proposed building for the proposed use authorized by the permit, may not be deprived of his right to continue such construction and use by the revocation of such permit, whether the revocation be by the enactment of an otherwise valid zoning ordinance or by other means, and this is true irrespective of the fact that such expenditures and actions by the holder of the permit do not result in any visible change in the condition of the land.

*Id.* (emphasis added).

Plaintiffs, however, counter that the Supreme Court's subsequent decision in *In re Campsites Unlimited Inc.,* 287 N.C. 493, 501, 215 S.E.2d 73, 78 (1975), altered that rule. In *Campsites,* the landowner, Campsites, purchased and began constructing a campsite development at a time when the county had no zoning ordinance at all applicable to rural areas. *Id.* at 495, 215 S.E.2d at 74. Subsequently, the county adopted a zoning ordinance that placed the area including Campsites' property in a zone that prohibited campsite developments. *Id.* at 496, 215 S.E.2d at 75. The Court applied *Town of Hillsborough* even though Campsites had not relied upon a building permit because:

The only significance of the building permit in those cases was that such permit was required, under the ordinance in effect at the time of its issuance, in order to make the proposed use of the property lawful. In the present instance, there was no county ordinance or other law in effect at the time Campsites began its development of its property which required Campsites to obtain a permit therefor. It was then lawful for Campsites to proceed as it did.

*Id.* at 501, 215 S.E.2d at 77-78. The Court concluded that "[s]ubstantial expenditures and obligations were made and incurred" and that if done so in good faith, "the adoption of the county zoning ordinance . . . did not deprive Campsites of its preexisting right to so develop and use its land." *Id.* at 502, 215 S.E.2d at 78.

Defendants contend that *Campsites* only applies when a landowner makes expenditures in reliance on a complete lack of zoning, while plaintiffs contend that *Campsites* stands for the proposition that "reliance upon existing zoning is sufficient to create vested rights." In other words, plaintiffs ask us to conclude that *Campsites* overruled *sub silentio* the language in *Town of Hillsborough* holding that the purchase of property in reliance on existing zoning is insufficient to give rise to a vested right.

We first note that Justice Lake authored both *Town of Hillsborough* and *Campsites*, and nothing in *Campsites*, which discusses the prior decision extensively, suggests any intent to limit the precedential effect of the *Town of Hillsborough* decision. Moreover, in *Finch v. City of Durham*, 325 N.C. 352, 366, 384 S.E.2d 8, 16 (1989), the Supreme Court described the holding in *Campsites* as follows: "We have held that when a property owner makes expenditures in the absence of zoning or under the authority of a building permit, subsequent changes in the zoning of the property may not prohibit the resulting nonconforming use."

Here, there was no absence of zoning, and, therefore, *Campsites* does not apply. Plaintiffs, however, also argue that their position is supported by this Court's decisions in *Russell v. Guilford County Bd. of Comm'rs*, 100 N.C. App. 541, 397 S.E.2d 335 (1990), and *Sunderhaus v. Bd. of Adjustment of Town of Biltmore Forest*, 94 N.C. App. 324, 380 S.E.2d 132 (1989).

In *Russell*, this Court wrote:

The obtaining of a building permit is not the crucial factual issue to be resolved when determining whether a party has acquired a vested right to continue development of land as a nonconforming use after rezoning. [*Campsites*, 287 N.C. at 501, 215 S.E.2d at 78]. To acquire a vested right under North Carolina law, "it is sufficient that, prior to . . . enactment of the zoning ordinance and with requisite good faith, he make a substantial beginning of construction and incur therein substantial expense." *Hillsborough*, 276 N.C. at 54, 170 S.E.2d at 909. *At issue in this case is whether plaintiff made "substantial expenditures" in reasonable reliance on the current zoning of the property before the County Commission rezoned three acres of his property.*

100 N.C. App. at 543, 397 S.E.2d at 336 (emphasis added). *Russell* does not, however, discuss or even cite the test set out in *Finch*, a decision recently cited favorably by the Supreme Court as setting out the law on vested rights. *See Robins v. Town of Hillsborough*, 361 N.C. 193, 197, 639 S.E.2d 421, 423 (2007). A panel of this Court cannot, of course, adopt an interpretation of a Supreme Court decision that is contrary to the Supreme Court's interpretation of its own precedent.

Moreover, the language in *Russell* is *dicta*. The Court ultimately held that "the trial court's findings of fact support its conclusion that the plaintiff had not incurred substantial expenditures for the commercial development of this property." *Russell*, 100 N.C. App. at 545, 397 S.E.2d at 337. The Court then added: "Since we find that the plain-

tiff did not make substantial expenditures, we need not address whether plaintiff's reliance on the [county Planning Staff's] conditional approval of the plan was reasonable." *Id.* Thus, the Court itself recognized that resolution of the reliance issue was not necessary given its holding regarding substantial expenditures.[1]

"Language in an opinion not necessary to the decision is *obiter dictum* and later decisions are not bound thereby." *Trustees of Rowan Technical Coll. v. J. Hyatt Hammond Assoc.*, 313 N.C. 230, 242, 328 S.E.2d 274, 281 (1985). Our Supreme Court has stressed: " '[I]t is a maxim not to be disregarded, that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit where the very point is presented for decision.' " *State v. Jackson*, 353 N.C. 495, 500, 546 S.E.2d 570, 573 (2001) (quoting *Moose v. Bd. of Comm'rs of Alexander County*, 172 N.C. 419, 433, 90 S.E. 441, 448-49 (1916)).

The pertinent language in *Sunderhaus*, decided before *Finch*, is likewise *dicta*. The landowners in *Sunderhaus* had already begun to install a satellite dish when the town adopted an ordinance requiring that landowners obtain a permit before starting installation. This Court first noted that "[i]n *Campsites*, our Supreme Court held that a party may acquire a right to build without a permit if the good faith expenditures are made at a time when no permit is required." *Sunderhaus*, 94 N.C. App. at 326, 380 S.E.2d at 134. Since the landowners made their satellite dish expenditures at a time when the ordinance did not require a permit, the case fell squarely within the *Campsites* rule. Nevertheless, the Court went on to say, without citing any authority: "Likewise, a substantial expenditure or the commencement of building at a time when one zoning ordinance is in effect will serve to make the provisions of that ordinance applicable to the builder, notwithstanding the enactment of new regulations prior to the completion of the project." *Id.* This latter statement was not necessary for the decision and, therefore, is nonbinding *dicta*.

Therefore, we hold that the controlling law remains, as set out in *Town of Hillsborough*, that a property owner does not acquire a vested right to develop land contrary to the provisions of a subsequently

---

1. We note that this portion of the *Russell* opinion is inconsistent with the suggestion that expenditures in reliance on current zoning is sufficient to give rise to a vested interest. If that was in fact the Court's intended holding, then there would be no need to leave open the question of reliance on other governmental approval, such as a conditional approval by the planning department staff.

enacted zoning ordinance simply based on the purchase of the land in reliance on existing zoning. *Town of Hillsborough*, 276 N.C. at 55, 170 S.E.2d at 909. A vested right can arise, however, if "a property owner makes expenditures in the absence of zoning," *Finch*, 325 N.C. at 366, 384 S.E.2d at 16, or without governmental approval when, at the time of the expenditures, no prior approval was required. *Sunderhaus*, 94 N.C. App. at 326, 380 S.E.2d at 133-34. This holding is consistent with the well-established principle that "no property owner has a *per se* vested right in a particular land-use regulation such that the regulation could remain 'forever in force, inviolate and unchanged.' " *Michael Weinman Assocs. Gen. P'ship v. Town of Huntersville*, 147 N.C. App. 231, 233, 555 S.E.2d 342, 345 (2001) (quoting *McKinney*, 239 N.C. at 237, 79 S.E.2d at 734).

Turning to the form of government approval required by the common law vested right analysis, this Court held in *Browning-Ferris*, 126 N.C. App. at 172, 484 S.E.2d at 414, that "[i]n those situations where multiple permits are required preliminary to the issuance of the building permit, and substantial obligations and/or expenditures are incurred in good faith reliance on the issuance of those permits, the party does acquire a vested right in those provision(s) of the ordinance or regulation pursuant to which the preliminary permit(s) was issued." Thus, *Browning-Ferris* establishes that permits other than a building permit may, when combined with substantial expenditures in reliance on the permit, give rise to a common law vested right.

Here, the Town's UDO, which was adopted in 1989, provided that "the use made of property may not be substantially changed . . . , substantial clearing, grading or excavation may not be commenced and buildings or other substantial structures may not be constructed, erected, moved or substantially altered except in accordance with and pursuant to one of the following permits . . . ." The listed permits included a zoning permit, a grading permit, a special use permit, a conditional use permit, an erosion control permit, and, if applicable, an architectural compliance permit.

Plaintiffs do not dispute (1) that they were required under the UDO to obtain a zoning permit, a grading permit, an erosion permit, and an architectural compliance permit; and (2) that they did not obtain any of those permits prior to making their expenditures. Since plaintiffs' expenditures were not in reliance on any permits and permits were required to proceed with the automobile dealership project, *Town of Hillsborough* and *Browning-Ferris* establish that no common law

vested right to complete the automobile dealership arose. *See also PNE AOA Media, L.L.C. v. Jackson County*, 146 N.C. App. 470, 480, 554 S.E.2d 657, 663 (2001) (holding that no vested right arose because "[w]hile it is true that no county permit was required, a permit from DOT was, and it is clear that PNE had not secured that permit before it began to erect the sign along State Highway 441").

Plaintiffs argue, however, that governmental approval other than a permit can give rise to a vested interest and point to two letters sent by the Town's Planning Department. On 28 June 2001, three months after Leith contracted to purchase the property, the Code Enforcement Officer sent "Mr. Jim Murray" a letter stating only: "This letter is to advise that a car dealership can be located in the General Business District as long as it can meet all zoning requirements, such as the setbacks, landscaping, parking, etc. Should you need further information, please advise." The letter did not reference any specific property.

On 30 November, 2001, the Code Enforcement Officer sent Mr. Danny Howell" a letter referencing the property at issue in this case. She wrote: "The above reference[d] property is located in the General Business Zoning District and is in the Highway Corridor District. Automobile Sales are a permitted use in the General Business District. However, all zoning requirements must be met per the Southern Pines Unified Development Ordinance. If you should have further questions, please advise." Although Leith closed on the property in January 2002, plaintiffs did not begin work on the site until December 2004, more than three years after the sending of these letters.

We need not specifically address what types of government approval, short of a permit, are sufficient for the common law vested right analysis because *Browning-Ferris* establishes that expenditures in reliance on letters such as these are not sufficient to give rise to a vested right. In *Browning-Ferris*, the plaintiff intended to construct and operate a transfer station. On 13 June 1994, the Director of the county Planning Department sent a letter to the plaintiff informing the plaintiff that the land on which it intended to build the transfer station was zoned Heavy Industrial ("HI") and that a transfer station was a permitted use in the HI zone. He explained further that the plaintiff would still have to meet watershed, driveway, parking, landscaping, and other requirements set out in the county zoning ordinance. 126 N.C. App. at 169, 484 S.E.2d at 413. In reliance on this letter, the plaintiff purchased the property. *Id.* Three months later, the technical review committee for the county conditionally approved the site development plan subject to

MLC AUTO., LLC v. TOWN OF SOUTHERN PINES

[207 N.C. App. 555 (2010)]

12 conditions. *Id.* Subsequently, the county board of commissioners adopted an amendment to the zoning ordinance providing that construction and operation of a transfer station would require a special use permit. *Id.*

The plaintiff argued that it had a common law vested right to proceed with the transfer station without a special use permit, as the ordinance had allowed prior to the amendment. This Court concluded that the plaintiff did not have a vested right to proceed with the transfer station consistent with the pre-amended ordinance, explaining: "In so holding we reject the arguments of [the plaintiff] that substantial expenditures in reliance on the pre-amended Ordinance, *the 13 June 1994 letter from [the planning director]* or the conditional approval of the site development plan gives rise to a vested right to construct and operate a transfer station." *Id.* at 172, 484 S.E.2d at 415 (emphasis added).

We see no meaningful basis for distinguishing *Browning-Ferris* from this case. The letter from the *Browning-Ferris* planning director is virtually identical with the 30 November 2001 letter from the Code Enforcement Officer in this case—it merely confirmed that a particular use was a permitted use in the applicable zone, but also stressed that the project would have to meet other requirements set out in the zoning ordinance.[2] We are bound by this Court's holding in *Browning-Ferris* that substantial expenditures in reliance on the prior version of the ordinance and a letter of this nature are not sufficient to give rise to a vested right.

Plaintiffs argue that *Browning-Ferris* does not apply because the zoning classification in that case never changed, while it did change in this case. That argument mistakes the nature of a common law vested right. The question presented by the vested right analysis is whether an amendment to an ordinance applies to development of the property that was started prior to the date of the amendment. Plaintiffs have cited no authority suggesting that the vested rights analysis varies if the amendment involves a change in the zoning classification rather than an increase in the requirements necessary for completion of a project. To the contrary, in *Sunderhaus,* 94 N.C. App. at 327, 380 S.E.2d at 134, one of the cases upon which plaintiffs rely, this Court applied the same vested rights analysis used in cases involving zoning classification

---

2. The 28 June 2001 letter in this case did not even specifically address this property. It did nothing more than reiterate the pertinent portion of the zoning ordinance.

changes to an appeal in which the zoning amendment did not change the permissible uses, but rather only added a permit requirement.

Plaintiffs further argue that *Huntington Props., LLC v. Currituck County*, 153 N.C. App. 218, 569 S.E.2d 695 (2002), should control the decision in this case rather than *Browning-Ferris*. To the extent that plaintiffs contend that *Huntington* should be more persuasive because it is a more recent decision, plaintiffs have mistaken the law. Since one panel of this Court may not overrule a second panel, when two decisions are inconsistent, we are required to follow the earlier decision. *See In re R.T.W.*, 359 N.C. 539, 542 n.3, 614 S.E.2d 489, 491 n.3 (2005) (in considering two lines of cases that developed in Court of Appeals—*Stratton* line and *Hopkins* line—Court held, under *In re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 36-37 (1989), that "[t]he *Hopkins* panel should have followed *Stratton*, which is the older of the two cases"). Accordingly, if *Huntington* is inconsistent with *Browning-Ferris*, we are required to follow *Browning-Ferris*.

We do not believe that we need to reach that question, however, since *Huntington*, even in the absence of *Browning-Ferris*, would not require a different result. In *Huntington*, Orchard Park, a mobile home park, was constructed in 1972 and initially approved to accommodate 440 mobile homes. 153 N.C. App. at 220, 569 S.E.2d at 698. During the 1970s and 1980s, Orchard Park operated at near capacity, but in 1987, the State limited the park to 140 mobile homes because of new restrictions on private wastewater systems. *Id.* In 1992, the county amended its UDO to prohibit mobile home parks altogether except for lawful nonconforming uses such as Orchard Park. *Id.* The plaintiff purchased Orchard Park in 1995 and subsequently sought to upgrade the wastewater treatment system and operate the mobile home park at the original capacity of 440 mobile homes. *Id.* at 220-21, 569 S.E.2d at 698-99. In 1996, however, the county amended its UDO again to provide that improvements to water and sewage treatment systems to accommodate more mobile homes in a mobile home park would be considered an impermissible enlargement of a nonconforming use. *Id.* at 221-22, 569 S.E.2d at 669. The plaintiff sued seeking an injunction prohibiting the county from enforcing the amendment against it.

This Court, after first concluding that, even before the amendment, the county's UDO prohibited more than 140 mobile homes, then addressed the plaintiff's argument that it had a common law vested right to operate 440 mobile homes. In the language relied upon by

MLC AUTO., LLC v. TOWN OF SOUTHERN PINES

[207 N.C. App. 555 (2010)]

plaintiffs in this case, the Court stated: "Plaintiffs could have established vested rights in Orchard Park by (1) obtaining zoning and building permits from the State which would have allowed them the right to expand Orchard Park, or (2) obtaining a final interpretation of the UDO from the County's Planning Staff stating that they were allowed to operate Orchard Park at a capacity over 140 units." *Id.* at 226, 569 S.E.2d at 701. The description of the second prong was, however, *dicta*. As this Court noted, "it would have been impossible for plaintiffs to have obtained permission to expand Orchard Park because a 440-unit mobile home park was not otherwise lawful at the time Orchard Park became nonconforming in 1992, much less when the Amendment was passed in 1996." *Id.* at 227, 569 S.E.2d at 702. Thus, the language set out in the second prong of the *Huntington* test was not necessary to the decision.

In any event, we are not persuaded that the two letters in this case would, even under the *Huntington* test, be sufficient to give rise to a vested right.[3] *Huntington* required "*a final interpretation* of the UDO from the County's Planning Staff stating that they were *allowed to operate Orchard Park at a capacity over 140 units.*" *Id.* at 226, 569 S.E.2d at 701 (emphasis added). Consistent with prior vested rights precedent, we read this language as requiring approval of the specific project and not just a reiteration of the UDO. *See Robins*, 361 N.C. at 197, 639 S.E.2d at 423 (observing that "our vested rights decisions have considered whether a plaintiff has a right *to complete his project* despite changes in the applicable zoning ordinances" (emphasis added)).

Here, the June 2001 letter did not address the specific parcel of land at all and, therefore, could not be a final interpretation approving the project sought to be developed by plaintiffs. With respect to the November 2001 letter, we do not view this letter as an "interpretation" of the UDO. The letter merely stated what was apparent on the face of the UDO and the zoning maps: that a particular piece of property was zoned as GB and that automobile sales were a permissible

---

3. While plaintiffs describe the generic letters in this case as "certificates of zoning compliance," they cite no authority of any type defining what constitutes a "certificate of zoning compliance" or whether a generic letter of the type here—not addressing a specific project—is a "certificate of zoning compliance." We further note that plaintiffs rely on treatises and not case law to support the proposition that a certificate of zoning compliance is valid governmental approval for purposes of a vested right. We express no opinion on whether a certificate of zoning compliance is sufficient because *Browning-Ferris* establishes that, in any event, a letter of the type relied upon in this case is not adequate government approval.

use in the GB district. If the Planning Staff had simply photocopied the pertinent schedule of the UDO and the zoning map, precisely the same information would have been conveyed. Nothing was interpreted. In addition, the letter—which was sent three years before Leith approached the Town about its actual intended auto park—did not address a specific project. The letter did not state that *plaintiffs'* proposed auto park could in fact be built on that parcel of land. Indeed, the letter stressed that, for any motor vehicle sales project, all zoning requirements would still have to be met.[4]

Plaintiffs argue that these letters are no different than the quarry permit found to be sufficient governmental approval to raise the issue of a common law vested right in *Simpson v. City of Charlotte*, 115 N.C. App. 51, 57-58, 443 S.E.2d 772, 776-77 (1994). In *Simpson*, however, the property owner applied for and received a permit allowing it to construct and operate a specific quarry on a parcel of land adjoining an existing quarry. In other words, because a permit was issued, there was a final approval by a zoning administrator of the construction and operation of a particular, described project. The same is not true of the letters in this case.[5]

If we were to accept plaintiffs' argument that a vested right could be based on letters, sent three years before a project materialized and confirming only that a use was expressly permitted within a particular zoning classification, we would in effect be allowing a property owner to obtain a vested right solely by making expenditures in reliance on existing zoning. Since, as we have explained, *Town of Hillsborough* does not permit such a result, we hold that plaintiffs' expenditures in reliance on the June and November 2001 letters did not result in a common law vested right.

Plaintiffs have, therefore, failed to demonstrate that their expenditures were in reliance upon government approval of their project, a

---

4. This Court in *Browning-Ferris* cited *Avco Com. Developers v. South Coast Reg. Comm'n*, 17 Cal. 3d 785, 132 Cal. Rptr. 386, 390-91, 553 P.2d 546, 551 (1976), *appeal dismissed and cert. denied*, 429 U.S. 1083, 51 L. Ed. 2d 529, 97 S. Ct. 1089 (1977), for the proposition that "preliminary governmental approval [is] not sufficient to support [a] vested right[.]" *Browning-Ferris*, 126 N.C. App. at 171-72, 484 S.E.2d at 414. In *Avco*, the court held that government approval issued prior to any submission of the details of the project was not sufficient for purposes of vested right analysis. 17 Cal. 3d at 794, 132 Cal. Rptr. at 391-92, 553 P.2d at 551-52.

5. Plaintiffs also cite *City of Winston-Salem v. Hoots Concrete Co.*, 37 N.C. App. 186, 245 S.E.2d 536, *disc. review denied*, 295 N.C. 645, 248 S.E.2d 249 (1978), but that case involved no discussion of vested rights.

critical element of their claim of a common law vested right. Accordingly, the trial court erred in granting summary judgment to plaintiffs and denying summary judgment to defendants on this claim.

### Plaintiffs' Appeal

[2] Plaintiffs, in their appeal, contend that the trial court erred in granting summary judgment to defendants on plaintiffs' claims for tortious interference with contract and tortious interference with prospective economic advantage based on their loss of a Suzuki dealership.[6] To establish tortious interference with contract, a plaintiff must show: (1) a valid contract between the plaintiff and a third person, (2) the defendant knew about that contract, (3) the defendant intentionally induced the third person not to perform the contract, (4) the defendant acted without justification, and (5) the plaintiff suffered actual damages. *Bloch v. Paul Revere Life Ins. Co.*, 143 N.C. App. 228, 239, 547 S.E.2d 51, 59, *disc. review denied*, 354 N.C. 67, 553 S.E.2d 35 (2001). To establish tortious interference with prospective economic advantage, a plaintiff must show that the defendant, without justification, induced a third party to refrain from entering into a contract with the plaintiff, which would have been made absent the defendant's interference. *Dalton v. Camp*, 138 N.C. App. 201, 211, 531 S.E.2d 258, 265 (2000), *rev'd on other grounds*, 353 N.C. 647, 548 S.E.2d 704 (2001).

Because, based on our review of the record, we believe that plaintiffs failed to present sufficient evidence that defendants acted without legal justification in rezoning the property, we address only that element of the tort claims. A person "acts without justification in inducing the breach of contract . . . if he has no sufficient lawful reason for his conduct." *Childress v. Abeles*, 240 N.C. 667, 675, 84 S.E.2d 176, 182 (1954). A plaintiff must show that the defendant was acting not "in the legitimate exercise of [his] own right, 'but with a design to injure the plaintiff or gain some advantage at his expense.' " *Dalton*, 138 N.C. App. at 211, 531 S.E.2d at 265 (quoting *Owens v. Pepsi Cola Bottling Co. of Hickory, N.C., Inc.*, 330 N.C. 666, 680, 412 S.E.2d 636, 644 (1992)).

---

6. The parties agree that the Town Council members, in their individual capacities, are entitled to legislative immunity as to these claims. The parties dispute, however, whether the doctrines of legislative and sovereign immunity protect the Town, the Town Council, and the Town Council members in their official capacities. As we conclude that summary judgment was properly granted to defendants on the merits, we do not address the immunity issues.

In arguing that defendants acted without justification, plaintiffs first point to the Fourth Circuit's decision upholding the district court's order abstaining from ruling on plaintiffs' state law claims, including the tortious interference claims, and staying decision on the federal constitutional claims pending decision of the land use and zoning issues in state court. *MLC*, 532 F.3d at 284. Pointing to the court's discussion whether summary judgment was warranted on the federal claims notwithstanding state law, plaintiffs argue that the Fourth Circuit effectively concluded that issues of fact exist regarding whether defendants acted with justification in rezoning the property. *See id.* at 281-82 (addressing Town's argument "that summary judgment was appropriate regardless of the resolution of Leith's vested rights claim"). Since the district court declined to rule on the state law issues, and the Fourth Circuit concluded that the district court properly did so, we cannot conclude that we are in any way bound by the Fourth Circuit's determination that issues of fact exist on the federal constitutional claims.

Plaintiffs also argue that this case is analogous to *Browning-Ferris Indus. of South Atlantic, Inc. v. Wake County*, 905 F. Supp. 312 (E.D.N.C. 1995). In *Browning-Ferris*, the individual plaintiff, Jonathan Garrity, had contracted to lease property he owned near Lake Crabtree to the second plaintiff, Browning-Ferris ("BFI"), for use as a solid waste facility. The Town of Morrisville approved the plaintiffs' site plan and that approval was upheld by the state courts despite challenges by nearby property owners. *Id.* at 315. Wake County also issued a land disturbing permit. *Id.* After the Town of Cary approved BFI's connecting to the Cary sanitary sewer system, the Town of Morrisville then issued a building permit for the facility. *Id.* The plaintiffs then obtained an easement from an adjacent property owner allowing a sewer line to run across his land to connect with the sewer line owned by Wake County that in turn connected with the Cary wastewater treatment plant. *Id.*

Subsequently, the Wake County Board of Commissioners discussed the suitability of locating a solid waste facility near Lake Crabtree. *Id.* Ultimately, the Board voted to adopt a resolution urging the State not to issue a pollutant discharge elimination system permit. *Id.* at 316. The Board also voted to adopt a resolution informing the Town of Cary that the county took the position that a prior agreement between Cary and the county gave the county the right to approve sewage flowing through its sewer line to Cary's treatment plant. *Id.* The Board then voted to deny BFI access to its sewer line and adopted a resolution notifying the Town of Cary of its denial. *Id.* BFI then terminated its contractual relationship with Garrity. *Id.*

Both BFI and Garrity brought suit against the county asserting violations of the state and federal constitutions. Garrity also asserted a cause of action for tortious interference with a contractual relation. On the latter claim, the court ultimately held that summary judgment should be denied due to the existence of genuine issues of material fact regarding the issue of legal justification. *Id.* at 324.

Prior to addressing this cause of action, however, the court had already concluded that plaintiffs had acquired both statutory vested rights (by virtue of the issuance of the building permit) and common law vested rights (based on the plaintiffs' making substantial expenditures in reliance on the site plan approval and the issuance of the building permit). *Id.* at 318-19. In addition, the court concluded that the county did not act with a legitimate objective because its actions were outside the county's jurisdiction. *Id.* at 320.

The court found that the location of the facility—which was the basis for the county's and the public's objections—"was not a matter rightfully within the Board's purview and that its concerns about the facility's storm water runoff was an issue best left to the responsible state regulatory agency. The County had no authority to regulate land use within the geographical confines of the Town of Morrisville." *Id.* at 320. The court added that "[i]n addition to having no jurisdiction over the tract of land" on which the facility was being built, the county's concern regarding the storm water runoff was a "matter . . . which falls under the jurisdiction of the [Department of Environment, Health and Natural Resources]," even if it "might have been a legitimate concern." *Id.* Further, the court concluded that the county's motives in acting were improper because the county's concern—the storm water runoff into Lake Crabtree—was unrelated to the action it took: barring the passage of effluent through its sewer line. *Id.* at 321.

The court ultimately held:

A thorough review of the evidence of record leads the court to the inescapable conclusion that defendant denied BFI access to the [sewer line] for the sole reason that defendant did not want plaintiffs to proceed with their plans to construct the [facility] on the Garrity tract. The reason for the denial of access had nothing to do with the effluent from the BFI facility that was to be sent through the [sewer line]. The County had already issued the one permit over which it had issuing authority, the land disturbing permit.

*Id.* In sum, the county in *Browning-Ferris* blocked a project in which the plaintiffs had a vested right for reasons outside the county's jurisdiction.

None of the factors pertinent in *Browning-Ferris* exist in this case. First, we have already concluded that plaintiffs did not have a vested right in their auto park project. In addition, defendants' actions fell squarely within the Town's jurisdiction to regulate land use within the Town. N.C. Gen. Stat. § 160A-382(a) (2009) ("For any or all these purposes, the city may divide its territorial jurisdiction into districts of any number, shape, and area that may be deemed best suited to carry out the purposes of this Part; and within those districts it may regulate and restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures, or land.").

Although plaintiffs argue that the evidence is undisputed that defendants' purpose was to "unlawfully stop Leith," plaintiffs do not address the motive behind the desire to prevent the auto park. Defendants had the authority to amend the zoning ordinance. *See* N.C. Gen. Stat. § 160A-385(a)(1) (2009) ("Zoning ordinances may from time to time be amended, supplemented, changed, modified or repealed."). This authority includes amendments to the zoning map. *Id.* ("In case, however, of a qualified protest against a zoning map amendment, that amendment shall not become effective except by favorable vote of three-fourths of all the members of the city council."). Because of this authority, it is not enough to show that defendants voted to rezone in order to bar plaintiffs' project; plaintiffs must show that defendants' reason for barring that project through rezoning was not a legitimate justification.

Plaintiffs argue that, just like Wake County in *Browning-Ferris*, defendants were acting "under the guise of protecting the public's interest." Plaintiffs have overlooked the critical distinction: Wake County, in *Browning-Ferris*, was acting in an area outside of its jurisdiction regarding an interest outside its authority, while the public interest in this case falls squarely within the authority and jurisdiction of defendants.

The evidence in the record indicates that the public objections and defendants' motive in stopping the auto park was a concern that such a project was not an appropriate use for that location since it was surrounded on three sides by residential districts and, on the fourth side, had a conservation area across the highway. The General Assembly has placed responsibility for addressing such a concern on defendants. *See*

N.C. Gen. Stat. § 160A-383 (2009) ("The [zoning] regulations shall be made with reasonable consideration, among other things, as to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such city."). Finally, the action taken by defendants directly related to the concern—they concluded that the use was not appropriate for the location and rezoned the location to make it a district more in character with the surrounding property. Thus, the rationale behind *Browning-Ferris* supports the grant of summary judgment in this case.

In *Carolina Water Serv., Inc. of N.C. v. Town of Atlantic Beach*, 121 N.C. App. 23, 464 S.E.2d 317 (1995), *disc. review denied*, 342 N.C. 894, 467 S.E.2d 901 (1996), this Court similarly concluded that summary judgment was appropriately granted to a town on a claim of tortious interference with contract. The plaintiff contended that the town had maliciously, intentionally, and unlawfully interfered with the plaintiff's contracts to furnish water service to various homeowners in an annexed area when the town offered the residents a discount to connect to newly-constructed town water lines. *Id.* at 27, 464 S.E.2d at 320. In concluding that the plaintiff had failed to present evidence showing that the defendants had acted without justification, the Court pointed out that the General Assembly had authorized municipalities to provide water to residents, that the setting of water rates and fees is a matter for the judgment and discretion of municipal authorities, and that a municipality has authority to extend its water lines to an annexed area when it is concerned that the residents in the annexed area are no longer receiving water service equal to that provided by the town to other areas within the municipal boundaries. *Id.* at 28-29, 464 S.E.2d at 321.

Thus, in *Carolina Water Service*, the town did not act without justification when it acted pursuant to legislatively-granted authority in order to address a public concern that the legislature had determined to be within the town's jurisdiction. Here, defendants acted pursuant to their legislatively-granted zoning authority to remedy a public concern—that the current zoning of the property was not consistent with the character of the neighborhood—that was a concern the legislature has stressed should be considered by municipalities. Accordingly, the trial court properly granted defendants' motion for summary judgment as to plaintiffs' claims for tortious interference with contract and prospective economic advantage.

SIGNATURE DEV. LLC v. SANDLER COMMERCIAL AT UNION, L.L.C.

[207 N.C. App. 576 (2010)]

We note that plaintiffs are, in effect, seeking to obtain the equivalent of a vested right without meeting the requirements for either a common law or statutory vested right. If we were to hold, as plaintiffs urge, that defendants were not legally justified in changing the zoning for plaintiffs' property after they knew about plaintiffs' plans for an auto park, that precedent would mean that even if a municipality lawfully rezoned property—prior to any right vesting—it could still be held liable for substantial damages. We do not believe that a municipality acts without justification if it exercises its zoning authority, in accordance with statutory authority, to amend the zoning map in a manner that does not violate any vested rights. *See Varner v. Bryan*, 113 N.C. App. 697, 702, 440 S.E.2d 295, 298 (1994) (holding that person acts with legal justification if he "does a wrongful act or exceeds his legal right or authority in order to prevent the continuation of the contract between the parties").

## Conclusion

In sum, we reverse the trial court's order granting summary judgment to plaintiffs on their claim of a common law vested right and remand for entry of summary judgment in defendants' favor. We affirm the trial court's entry of summary judgment in defendants' favor on the claims for tortious interference with contract and tortious interference with prospective economic advantage.

Affirmed in part; reversed and remanded in part.

Judges ROBERT C. HUNTER and CALABRIA concur.