K&M Collision, LCC v. N.C. Farm Bureau Mut. Ins. Co., 2017 NCBC 107.

STATE OF NORTH CAROLINA

CATAWBA COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 308

K&M COLLISION, LLC,

        Plaintiff,

v.

NORTH CAROLINA FARM BUREAU
MUTUAL INSURANCE COMPANY,
INC.; DARRYL PRITCHARD;
CONNIE MELTON; LEE HANKINS;
CHRISTOPHER G. MANN; SHANE J.
CRAFTON; DEXTER SHORT; DOUG
CARPENTER; ERIN W. VALENTINE;
ERIC HOOKS; and ROBERT
CALLAHAN,

        Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION FOR
JUDGMENT ON THE PLEADINGS**

1.    **THIS MATTER** is before the Court on Defendants' Motion for Judgment on the Pleadings (the "Motion") filed on September 7, 2017.  (ECF No. 94.)  For the reasons set forth below, the Court hereby **DENIES** the Motion.

> *Law Offices of James Scott Farrin, by Gary W. Jackson and Christopher R. Bagley, and Law Offices of Jason E. Taylor, P.C., by Lawrence E. Serbin, for Plaintiff.*
>
> *Young Moore and Henderson, P.A., by Walter E. Brock, Glenn C. Raynor, and David W. Earley, and Patrick, Harper & Dixon, LLP, by David W. Hood, for Defendants.*

## I.   PROCEDURAL HISTORY

2.    The Court sets forth here only those portions of the procedural history relevant to its determination of the Motion.

3.     Plaintiff K&M Collision, LLC ("Plaintiff" or "K&M") initiated this action on February 8, 2017 by filing its verified Complaint asserting claims against Defendants North Carolina Farm Bureau Mutual Insurance Company, Inc. ("Farm Bureau"), Darryl Pritchard ("Pritchard"), Connie Melton ("Melton"), Lee Hankins ("Hankins"), Christopher G. Mann ("Mann"), Shane J. Crafton ("Crafton"), Dexter Short ("Short"), Doug Carpenter ("Carpenter"), Erin W. Valentine ("Valentine"), Eric Hooks ("Hooks"), and Robert Callahan ("Callahan"), (collectively, the "Defendants"). (ECF No. 12.)

4.     This action was designated as a complex business case under Rules 2.1 and 2.2 of the General Rules of Practice for the Superior and District Courts and was assigned to the undersigned by order of the Chief Justice of the Supreme Court of North Carolina dated April 5, 2017. (ECF No. 45.)

5.     Defendant Mann filed his First Amended Answer on March 29, 2017. (ECF No. 43.) Defendants Crafton and Hooks filed separate answers on April 17, 2017. (ECF Nos. 46–47.) Defendants Callahan, Melton, and Pritchard filed separate answers on April 18, 2017. (ECF Nos. 48–50.) Defendants Hankins, Valentine, Carpenter, and Short filed separate answers on April 21, 2017. (ECF Nos. 51–54.) Farm Bureau filed an answer on May 8, 2017, (ECF No. 55), and then filed its First Amended Answer and Counterclaim on June 6, 2017, (ECF No. 61).

6.     Defendants filed the Motion and a brief in support on September 7, 2017 seeking judgment on the pleadings as to some, but not all, of Plaintiff's claims. (ECF Nos. 94–95.)

7.     On November 14, 2017, the Court held a hearing on the Motion at which all parties were represented by counsel.

8.     Following the hearing on the Motion, on November 15, 2017, Plaintiff filed a Notice of Voluntary Dismissal, dismissing its libel *per se* claim as to all Defendants and dismissing its claim for a declaratory judgment as to Defendant Short, both without prejudice.  (ECF No. 125.)

9.     The Motion has been fully briefed and is now ripe for resolution.

## II.    FACTUAL BACKGROUND

10.     The Court does not make findings of fact on a motion for judgment on the pleadings under Rule 12(c) of the North Carolina Rules of Civil Procedure ("Rule(s)"), but only recites the factual allegations of the Complaint and the undisputed factual allegations of the Defendants' answers.

### A.     The Parties

11.     Plaintiff is a North Carolina company that has operated as an auto body repair shop in Catawba County since 1991.  (Compl. ¶¶ 1–2, ECF No. 12.)  Meredith Bradshaw ("Ms. Bradshaw") is K&M's president and her son, Michael Bradshaw ("Mr. Bradshaw"), is K&M's Vice President of Operations.   (Compl. ¶¶ 62, 67.) Neither Ms. Bradshaw nor Mr. Bradshaw are parties to this litigation.

12.     Defendant Farm Bureau is a North Carolina corporation licensed to sell auto insurance by the North Carolina Department of Insurance.  (Compl. ¶¶ 4–5.)

13.     Defendants Pritchard, Melton, Hankins, Mann, Crafton, Short, Carpenter, Valentine, Hooks, and Callahan are past or present employees of Farm Bureau.

(Compl. ¶¶ 6, 8, 10, 12, 14, 16, 18, 20, 22, 24.)  Defendant Pritchard is Farm Bureau's chief appraiser, (Compl. ¶ 6), and Defendant Short was Farm Bureau's field claim manager at all relevant times, (Compl. ¶ 14).

B.    **Plaintiff's Administrative and Diagnostic Analysis Fees**

14.    Plaintiff alleges that when a vehicle owner insured by Farm Bureau ("first-party claimant") sustains damage to a vehicle that is covered under a Farm Bureau policy, or when a vehicle owner sustains damage to his or her vehicle caused by the fault of a Farm Bureau insured ("third-party claimant"), Farm Bureau must repair or replace the vehicle with like kind and quality as required by the terms of the standard insurance policy mandated by the state of North Carolina and the North Carolina Department of Insurance .  (Compl. ¶¶ 28–31.)

15.    After a vehicle is damaged, it is typical business practice for insurers to require first- and third-party claimants (together, the "claimants") to get an initial estimate of the cost to repair the damaged vehicle.  (*See* Compl. ¶¶ 97, 147.)  After the initial estimate, additional hidden damage is often discovered when vehicles are examined more thoroughly, necessitating supplemental repairs and increasing the estimated repair costs.  (Compl. ¶¶ 56, 60.)  When the total repair estimate exceeds seventy-five percent of the vehicle's total pre-accident value, the insurer is required under the North Carolina Administrative Code to declare the vehicle a "total loss." (*See* Compl. ¶ 39; *see also* 11 N.C. Admin. Code 04 .0418(5).)

16.    When a vehicle brought to Plaintiff for repairs is declared a total loss after Plaintiff has taken possession of the vehicle and performed diagnostic work, Plaintiff

charges the owner of the vehicle "administrative fees" and "diagnostic analysis fees" to compensate itself for the time and effort expended in receiving the vehicle and evaluating the damage. (Compl. ¶¶ 39, 130.) Plaintiff alleges that these fees are only charged for the small fraction of claims where a vehicle brought to Plaintiff is later declared by the insurer to be a total loss. (Compl. ¶ 39.)

## C. Farm Bureau's Alleged Campaign Against Plaintiff

17. Plaintiff alleges that from June 2014 through the date of the filing of the Complaint, "Farm Bureau, at the direction of Pritchard and other management personnel, . . . have [sic] engaged in a deliberate campaign to cause economic, competitive and reputational harm to [Plaintiff], in violation of North Carolina law and public policy against defamation, tortious interference, restraint of trade and steering" in an attempt to dissuade vehicle owners from using Plaintiff to repair their vehicles. (*See* Compl. ¶ 35.)

### 1. Threats to Blacklist Plaintiff

18. According to Plaintiff, in June 2014, Defendant Pritchard and another Farm Bureau adjuster who is not a party to this litigation came to Plaintiff's premises to inspect a vehicle brought there for repair by a Farm Bureau insured. (Compl. ¶ 63.) Plaintiff alleges that Ms. Bradshaw "sensed hostility" from the two Farm Bureau employees "and asked Pritchard why the relationship between [Plaintiff] and Farm Bureau had recently soured[.]" (Compl. ¶ 66.) Plaintiff alleges that Pritchard told Ms. Bradshaw that the relationship had soured because of Mr. Bradshaw and that Farm Bureau and other insurers would "blacklist" Plaintiff if Mr. Bradshaw

continued in his employment with Plaintiff. (Compl. ¶¶ 67–69.) Plaintiff does not provide further explanation in the Complaint as to the origin of the hostility between Defendants and Mr. Bradshaw.

### 2. Defendant Short's Letters to Plaintiff

19. Plaintiff alleges that Defendant Short sent two letters to Plaintiff in early 2015. (Compl. ¶¶ 40, 43.) Defendant Short's first letter to Plaintiff was dated January 9, 2015 (the "January 9th letter") and claimed that Farm Bureau had an absolute right to re-inspect vehicles before Plaintiff made any additional repairs not provided for in the initial estimate. (Compl. ¶ 43.) Defendant Short's first letter also stated that Farm Bureau intended to notify its claimants that that if car owners who have selected Plaintiff for repairs allow Plaintiff to perform repairs before Farm Bureau has been given an opportunity to inspect the vehicle, they do so at the risk of being personally responsible for additional costs and expenses, as Farm Bureau "is not a party to any agreement [the customer] make[s] with [Plaintiff], and is therefore not bound by any such agreement." (Compl. ¶ 45.)

20. Defendant Short's second letter, sent to Mr. Bradshaw and dated March 4, 2015 (the "March 4th letter"), stated that Farm Bureau "has recently encountered charges on [Plaintiff's] invoices for a 'Diagnostic Analysis Fee' and 'Administrative Fees' and [Plaintiff] has refused to release vehicles until these fees are paid." (Compl. ¶¶ 40–41, Ex. A.) As to the diagnostic fee, the March 4th letter stated that "if the vehicle is determined to be a total loss, no 'Diagnostic Analysis Fee' is warranted." (Compl. Ex. A.) As to the administrative fees, the March 4th letter indicated that

Farm Bureau "does not take the position that [Plaintiff] cannot charge an 'Administrative Fee' to its clients; however, [Farm Bureau] will not pay those fees[,]" as they "are not included in the scope of our liability under the law or the terms and conditions of our policy." (Compl. Ex. A.) Defendant Short's March 4th letter advised Plaintiff that Farm Bureau intended to inform all claimants that if they select Plaintiff for repairs, Farm Bureau will not pay Plaintiff's administrative fees or any additional storage charges incurred as a result of Plaintiff's refusal to release a claimant's vehicle until such fees are paid. (Compl. Ex. A.) Plaintiff alleges that Farm Bureau had never previously objected to Plaintiff's diagnostic or administrative fees and paid them on a routine basis. (Compl. ¶ 46.)

### 3.     The Uncovered Fees Letter

21.     Around June 2015, Farm Bureau began sending a letter to claimants who selected Plaintiff for repairs informing them of certain charges that would not be covered by Farm Bureau (the "Uncovered Fees Letter"). (Compl. ¶ 49.) Plaintiff attached a copy of the letter to the Complaint, which reads in pertinent part:

> This letter is directed at all insureds of [Farm Bureau] and/or any person asserting a property damage claim for damage to your motor vehicle against a person insured by [Farm Bureau]. Please be advised that you have the right to have your vehicle repaired at the body shop of your choice. If you have selected K&M Collision in Hickory, NC, please be advised that you may incur certain charges that will not be covered by [Farm Bureau], including, but not limited to charges for "Administrative Fees" and/or "Diagnostic Analysis Fees."
>
> If [Farm Bureau] is responsible for storage fees on your vehicle, we will not pay any additional storage fees that may be incurred because K&M Collision elects not to release the vehicle until they are paid for "Administrative Fees" and/or "Diagnostic Analysis Fees." You may be personally responsible for paying those fees, as well as any additional

storage fees that accrue pending payment of these fees.  K&M Collision has the right to charge its customers as they see fit, but this letter is to advise you that some charges may not be covered by [Farm Bureau]. . . .

(Compl. Ex. B.)

22.     Notwithstanding the statement in the Uncovered Fees Letter that it is sent to all Farm Bureau claimants, Plaintiff alleges that the letter was sent only to those claimants who wished to use Plaintiff for repairs.  (Compl. ¶ 50.)  Plaintiff further alleges that the Uncovered Fees Letter was sent to claimants prior to Farm Bureau's inspection of the vehicle and regardless of whether the claimant's vehicle was expected to be a total loss.  (Compl. ¶¶ 53, 56.)  Because only a small percentage of claims are declared a total loss, even after disassembly reveals the need for supplemental repairs, Plaintiff alleges that sending the letter to all claimants who wished to take their vehicles to Plaintiff was unwarranted and designed to steer customers away from Plaintiff.  (Compl. ¶¶ 52–53, 56, 217(b).)

### 4.     Defendants' Defamatory and Misleading Oral Statements

23.     Plaintiff alleges that Defendants made oral defamatory statements to Plaintiff's current and prospective customers, stating or implying that Plaintiff is not up to industry standards, (Compl ¶ 98); is not fair, (Compl. ¶ 99); overcharges for its repair work, (Compl. ¶¶ 104, 126, 158, 172, 183(c)); performs unnecessary repairs and has excessive fees, (Compl. ¶¶ 127, 150(a), 167(d), 172, 183(c)); does not have good business practices, (Compl. ¶ 127); is not a good repair shop, (Compl. ¶ 183(d)); is difficult to deal with, (Compl. ¶¶ 150(b), 183(a)–(b)); and is horrible or awful, (Compl. ¶¶ 183(a), 184).  Plaintiff also contends that Defendants recommended that some

claimants use a repair shop other than Plaintiff.  (Compl. ¶¶ 99, 103, 138, 152, 155, 190.)  Plaintiff asserts that these statements were made to discourage claimants from taking their vehicles to Plaintiff for repairs.  (Compl. ¶ 227.)

### 5.    Defendants' Conduct in Processing Claims

24.    The Complaint alleges that Farm Bureau intentionally created delays in processing claims for vehicles taken to Plaintiff for repairs, in part by using a special adjuster and then an independent appraiser assigned to all claims involving Plaintiff.  (Compl. ¶¶ 33, 79–80.)  It is undisputed that Farm Bureau assigned Defendant Pritchard to handle all claims where a claimant selected Plaintiff for repairs.  (Compl. ¶ 33; First Am. Answer Farm Bureau ¶ 33, ECF No. 43.)  Plaintiff alleges that this practice "is uniquely targeted to [it]," as Farm Bureau does not assign a special adjuster or appraiser to handle all claims at any other repair shop.  (Compl. ¶¶ 33, 80.)

25.    Beginning in April 2016, Farm Bureau engaged William Hawfield ("Hawfield"), a non-party to this litigation, as an independent appraiser to process all claims involving Plaintiff because of tensions between Plaintiff and Defendant Pritchard.  (Compl. ¶ 71.)  Plaintiff contends that Hawfield is "a surrogate, without true independence" from Farm Bureau and has been used by Farm Bureau "to delay, harass, and interfere with [Plaintiff]'s operations."  (Compl. ¶¶ 77–78.)  For instance, Plaintiff alleges that Farm Bureau refused to process any claims involving vehicles taken to Plaintiff for repair for a ten-day period when Hawfield was on vacation, thus

creating unnecessary delays and harming Plaintiff's business and reputation. (Compl. ¶¶ 78, 80.)

26. Plaintiff further alleges that when it ultimately repaired vehicles for Farm Bureau's insureds or claimants, Defendants delayed making payment for the repairs, refused to pay the full amount necessary to repair the vehicle, and refused to pay repair rates that it promised to Plaintiff. (Compl. ¶¶ 90–91, 117, 120, 143, 167(h), 185.)

27. Plaintiff also contends that Defendants further delayed the processing and resolution of claims by insisting that they be permitted to re-inspect vehicles before Plaintiff could begin repairs, and then refusing to arrange mutually agreeable times for re-inspection. (Compl. ¶ 44.)

28. In addition, Plaintiff alleges that Defendants improperly declared vehicles brought to Plaintiff for repairs as a total loss in an effort to harm Plaintiff's business. (Compl. ¶¶ 81, 130, 199, 207.) Plaintiff alleges that Hawfield told Plaintiff that Farm Bureau had decided to single out Plaintiff by uniformly declaring all vehicles brought to Plaintiff as a total loss when the cost of repairs would total forty-percent of the vehicle's value, substantially less than the seventy-five percent threshold mandated by North Carolina law. (Compl. ¶¶ 81, 209; *see also* 11 N.C. Admin. Code 04 .0418(5).)

**D. Defendants' Interactions with Plaintiff's Customers**

29. The Complaint describes Defendants' interactions with twelve of Plaintiff's customers and potential customers in processing insurance claims for repair of their vehicles. (Compl. ¶¶ 82–210.)

### 1. Customers with Whom Plaintiff Had Repair Contracts

30. The Complaint alleges that Plaintiff had binding contracts with nine of the twelve customers described in the Complaint and that Defendants induced these customers to breach their repair contracts with Plaintiff. (Compl. ¶¶ 224, 227.) Plaintiff further alleges that Defendants were not parties to these repair contracts, as acknowledged by Defendant Short's January 9th letter, (Compl. ¶¶ 45, 225), and contends that Defendants were aware of Plaintiff's contracts with the nine claimants. (Compl. ¶ 226.) Despite this knowledge, Plaintiff avers that Defendants maliciously induced these nine customers to breach their contracts with Plaintiff through the above-described campaign. (Compl. ¶ 228.)

31. As to three of these nine customers with whom Plaintiff had repair contracts, Farm Bureau ultimately declared their vehicles to each be a total loss, thus avoiding the need for repairs and causing Plaintiff to lose the income expected from those repairs. (Compl. ¶¶ 130, 199–200, 207, 210.) As to one customer in particular, the Complaint alleges that Plaintiff prepared an estimate concluding that it would cost $15,351.50 to repair the customer's vehicle, a 2016 Ford F-150 with a market value of over $40,000. (Compl. ¶ 198.) Plaintiff claims that Farm Bureau declared the vehicle to be a total loss, notwithstanding the fact that the repair estimate was for less than forty percent of the vehicle's value. (Compl. ¶ 199.)

32. Plaintiff repaired the vehicles of the six other customers with whom it had repair contracts. (Compl. ¶¶ 91, 117, 142, 167(h), 176, 185.) Of these six, Plaintiff alleges that Farm Bureau refused to pay the full amount necessary to repair or

replace three customers' vehicles as required by the standard auto insurance policy in North Carolina. (Compl. ¶¶ 89, 93, 117, 121, 185.) As to the remaining three customers, Plaintiff alleges that Farm Bureau withheld payment for significant periods of time before ultimately paying the full repair cost. (Compl. ¶¶ 143, 167(h), 176.) Plaintiff alleges that as to the first customer, the delay in payment harmed Plaintiff's reputation with the customer and caused Plaintiff to incur additional expenses, (Compl. ¶ 143); as to the second customer, Farm Bureau paid the full cost of repairs only after the customer threatened legal action, (Compl. ¶ 167(h)); and as to the third customer, Farm Bureau only paid the full repair cost after requiring the customer to execute a "Policyholders' Release," which Plaintiff alleges was in violation of Farm Bureau's policy terms and North Carolina law, (Compl. ¶ 176).

### 2. Customers Who Selected a Repair Shop Other Than Plaintiff

33. Plaintiff also alleges that at least three prospective customers would have contracted with Plaintiff for vehicle repairs but for Defendants' campaign to drive customers away. (Compl. ¶¶ 107, 153, 195.) One of those customers allegedly told Plaintiff that "it was obvious to him that Defendant Farm Bureau did not like [Plaintiff]" and believed that Farm Bureau was attempting to steer him away from Plaintiff. (Compl. ¶ 106.) Another customer who ultimately selected a different repair shop allegedly said that "when she told Farm Bureau that she was taking her vehicle to Plaintiff, 'they freaked out[,]'" made negative comments about Plaintiff, and when asked what the customer was supposed to do, an unknown employee of Farm Bureau allegedly told her "to go to 'one of the two shops down the road.'" (Compl.

¶¶ 148, 150, 152.) According to Plaintiff, the third customer was told that selecting a different repair shop "would work best for everyone" and that if she selected Plaintiff, a special adjuster would have to be assigned to handle her claim. (Compl. ¶¶ 190, 194.) Plaintiff alleges that it lost prospective income that it would have earned from the repairs for these three customers had it not been for Defendants' unlawful interference. (Compl. ¶¶ 107–08, 153, 195.)

### E.  Claims

34. Plaintiff currently asserts the following claims for relief in its verified Complaint: (1) libel *per quod*, slander *per se*, and slander *per quod* against Defendants Farm Bureau, Pritchard, Hooks, Crafton, Carpenter, and Callahan; (2) tortious interference with contract and prospective economic advantage against all Defendants; (3) unfair and deceptive trade practices ("UDTP") against all Defendants; (4) breach of contract against Farm Bureau; (5) a declaratory judgment action against all Defendants except Defendant Short; and (6) punitive damages against all Defendants. (Compl. 35, 41, 46, 48, 49–50.) Plaintiff has previously voluntarily dismissed its claim for libel *per se* against all Defendants and its declaratory judgment action against Defendant Short.

35. Defendants' Motion seeks judgment on the pleadings on Plaintiff's claims for (1) libel *per se*; (2) tortious interference with contract and prospective economic advantage; (3) UDTP against Defendant Short; (4) declaratory judgment against Defendant Short; and (5) punitive damages against Defendant Short. (Defs.' Mot. J. Pleadings 1, ECF No. 94.)

## III. LEGAL STANDARD

36.     "A motion for judgment on the pleadings should not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Carpenter v. Carpenter*, 189 N.C. App. 755, 761, 659 S.E.2d 762, 767 (2008).  On a Rule 12(c) motion, "[t]he movant is held to a strict standard and must show that no material issue of facts exists and that he is clearly entitled to judgment." *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974).  "[T]he court cannot select some of the alleged facts as a basis for granting the motion on the pleadings if other allegations, together with the selected facts, establish material issues of fact." *J. F. Wilkerson Contracting Co. v. Rowland*, 29 N.C. App. 722, 725, 225 S.E.2d 840, 842 (1976).  The Court must read the pleadings in the light most favorable to the nonmoving party, and

> [a]ll well pleaded factual allegations in the nonmoving party's pleadings are taken as true and all contravening assertions in the movant's pleadings are taken as false.  All allegations in the nonmovant's pleadings, except conclusions of law, legally impossible facts, and matters not admissible in evidence at the trial, are deemed admitted by the movant for purposes of the motion.

*Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499 (citations omitted).  In ruling on a 12(c) motion, the Court may consider documents attached to and incorporated within the Complaint. *Weaver v. Saint Joseph of the Pines, Inc.*, 187 N.C. App. 198, 204–05, 652 S.E.2d 701, 707–08 (2007).

37.     "Judgment on the pleadings is not favored by the law . . . ." *Huss v. Huss*, 31 N.C. App. 463, 466, 230 S.E.2d 159, 162 (1976).  Rule 12(c)'s function "is to dispose of baseless claims or defenses when the formal pleadings reveal their lack of merit."

*Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499. "[J]udgment on the pleadings is not appropriate merely because the claimant's case is weak and he is unlikely to prevail on the merits." *Huss*, 31 N.C. App. at 469, 230 S.E.2d at 163. "A motion for judgment on the pleadings is allowable only where the pleading of the opposite party is so fatally deficient in substance as to present no material issue of fact . . . ." *George Shinn Sports, Inc. v. Bahakel Sports, Inc.*, 99 N.C. App. 481, 486, 393 S.E.2d 580, 583 (1990).

## IV. ANALYSIS

### A. Tortious Interference Claim

38. The elements of a claim for tortious interference with contract are:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).

39. To sustain an action for tortious interference with prospective economic advantage, "a plaintiff must show that defendant, without justification, induced a third party to refrain from entering into a contract with plaintiff, which would have been made absent the defendant's interference." *MLC Auto., LLC v. Town of Southern Pines*, 207 N.C. App. 550, 570, 702 S.E.2d 68, 79 (2011).

40. Claims for tortious interference with contract and prospective economic advantage are properly dismissed under Rule 12(c) where the complaint shows that the interference was justified or privileged. *See Peoples Sec. Life Ins. Co. v. Hooks*,

322 N.C. 216, 220, 367 S.E.2d 647, 650 (1988) (affirming dismissal of a tortious interference with contract claim on a Rule 12(b)(6) motion). However "[t]he privilege [to interfere] is conditional or qualified; that is, it is lost if exercised for a wrong purpose." *Id.* at 221, 367 S.E.2d at 650 (alterations in original). An interference is unjustified when it is done "not in the legitimate exercise of defendant's own right, but with design to injure the plaintiff, or gaining some advantage at his expense." *Owens v. Pepsi Cola Bottling Co.*, 330 N.C. 666, 680, 412 S.E.2d 636, 644 (1992). Stated differently, "[i]nterference is without justification if a defendant's motive is not reasonably related to the protection of a legitimate business interest." *Sellers v. Morton*, 191 N.C. App. 75, 81–83, 661 S.E.2d 915, 921–22 (2008) (quotation marks omitted).

41. Defendants argue that the Court should grant the Motion and dismiss Plaintiff's claim for tortious interference with contract and tortious interference with prospective economic advantage because Farm Bureau's legitimate business interest in getting damaged vehicles repaired for a reasonable price is a complete bar to Plaintiff's claim, "irrespective of [Plaintiff]'s allegations of malice." (Defs.' Br. Supp. 13.)

42. North Carolina's case law paints a less-than-clear picture of when a defendant's interference is justified by a legitimate business interest. Many cases purport to apply a bright-line rule that for the interference to be unjustified, "the complaint must admit of no motive for the interference other than malice." *See, e.g., Wagoner v. Elkin City Sch. Bd. of Educ.*, 113 N.C. App. 579, 587, 440 S.E.2d 119, 124

(1994); *Privette v. Univ. N.C.*, 96 N.C. App. 124, 134–35, 385 S.E.2d 185, 191 (1989). Courts have applied this rule in at least some cases where defendant's interference simultaneously served a legitimate business interest and potentially a malicious ulterior motive. *Wagoner*, 113 N.C. App. at 587, 440 S.E.2d at 124; *Privette*, 96 N.C. App. at 134–35, 385 S.E.2d at 190–91. However, other cases reveal that this line is not so bright as it may first appear.

43. For instance, our Supreme Court unanimously held that dismissal of a plaintiff's tortious interference with contract claim on a Rule 12(b)(6) motion was improper where plaintiff alleged that defendants' conduct was not within their qualified privilege to interfere and there were questions concerning defendants' motives. *Embree Constr. Grp. v. Rafcor, Inc.*, 330 N.C. 487, 499, 411 S.E.2d 916, 925 (1992). In *Embree*, this State's highest court stated that justification for interference with contract is in the nature of an affirmative defense and that it is not proper at the pleading stage to demand that plaintiff's complaint negate facts that support the defense. *Id.* at 499–500, 411 S.E.2d at 925. Additionally, there are a number of cases from this Court in which the Court has declined to dismiss a tortious interference claim notwithstanding the fact that defendant arguably had a legitimate business interest in plaintiff's contract with a third party where there was a question as to whether defendant's actions were related to defendant's legitimate interest or were done to harm the plaintiff. *See, e.g.*, *Hopkins v. MWR Mgmt. Co.*, 2017 NCBC LEXIS 47, at *51–52 (N.C. Super. Ct. May 31, 2017) (denying summary judgment where a question of fact remained as to whether defendant's conduct was intended to harm

plaintiff rather than to protect defendant's legitimate interest); *HSG, LLC v. Edge-Works Mfg. Co.*, 2015 NCBC LEXIS 91, at *15–16 (N.C. Super. Ct. Oct. 5, 2015) (denying motion to dismiss where the factual allegations were sufficient to state that the interference was malicious and unjustified); *Allegis Grp., Inc. v. Zachary Piper LLC*, 2014 NCBC LEXIS 37, at *36 (N.C. Super. Ct. Aug. 7, 2014) ("Where there is an issue as to a defendant's intent, summary judgment is inappropriate."). Although the above-cited cases are factually and procedurally distinct from this case, the Court believes they stand for the proposition that dismissal at the pleading stage is inappropriate where questions of fact remain as to Defendants' justification for interfering with Plaintiff's business relations.

44.    In support of their argument that they have an absolute privilege to interfere with Plaintiff's business relations with its current and prospective customers, Defendants rely on *Williams v. State Farm Mut. Auto. Ins. Co.*, 67 N.C. App. 271, 312 S.E.2d 905 (1984). (Defs.' Br. Supp. 10–13.)  In *Williams*, the Court of Appeals affirmed a directed verdict in favor of defendant auto insurer and its agents as to plaintiff body shop owner's tortious interference with contract claim, concluding that defendants' interference was justified by a legitimate business interest in getting insured automobiles repaired correctly and for the lowest price. *Id.* at 277, 312 S.E.2d at 909.  The Court of Appeals held that "[i]f the outsider has a sufficient lawful reason for inducing the breach of contract, he is exempt from liability for so doing, no matter how malicious in actuality his conduct may be." *Id.*  However, *Williams* not only

predated our Supreme Court's decision in *Embree*, but was decided at a much later stage of litigation than a Rule 12 motion.

45.     Defendants also rely on *Pack Bros. Body Shop, Inc. v. Nationwide Mutual Insurance Co.*, 2003 NCBC LEXIS 2 (N.C. Super. Ct. Jan. 10, 2003) (Tennille, J.), a case from the North Carolina Business Court, arguing that the court in that case "viewed *Williams* as holding that the insurer's legitimate interest in having vehicles repaired correctly and for a good price barred the plaintiff's tortious interference claim." (Defs.' Reply Br. Supp. Mot. J. Pleadings 5, ECF No. 120 (citing *Pack Bros. Body Shop, Inc.*, 2003 NCBC LEXIS 2, at *27)). Judge Tennille did not make such a strong pronouncement in *Pack Brothers* as characterized by Defendants, as the court never discussed *Williams* in relation to a tortious interference claim. *Pack Bros. Body Shop, Inc.*, 2003 NCBC LEXIS 2, at *29, 32. Judge Tennille did, however, discuss *Williams* in relation to plaintiffs' defamation claim, where he declined to hold that an insurer's interest in getting automobiles repaired correctly and for the lowest price granted an absolute privilege in the defamation context, noting that in *Williams* the "Court of Appeals found only a *protectable* interest." *Id.* at *26–27 (emphasis added). The opinion, therefore, suggests that an insurer's interest in getting vehicles repaired inexpensively and correctly does not grant an absolute privilege to engage in tortious behavior.

46.     Despite Defendants' contentions to the contrary, the fact that Defendants unquestionably have a *protectable* interest in getting vehicles repaired for the lowest price does not foreclose the question of whether or not Defendants' interference was

reasonably related to that legitimate business interest. Here, Plaintiff alleges that prior to the alleged campaign to steer customers away from Plaintiff, Defendant Pritchard told Ms. Bradshaw that Farm Bureau and other insurers would "blacklist" Plaintiff if Mr. Bradshaw continued to work for the company. (Compl. ¶¶ 68–69; First Am. Answer Farm Bureau ¶¶ 68–69; Answer Darryl Pritchard ¶¶ 68–69, ECF No. 50.) The Complaint also alleges that Farm Bureau's agent, Hawfield, told Plaintiff that Farm Bureau had decided to declare all vehicles taken to Plaintiff as total losses where the cost of repairs was at least forty percent of the vehicle's total value. (Compl. ¶ 209.) The Complaint claims that on several occasions Defendants declared a vehicle to be a total loss either without properly inspecting the damage to the vehicle or when the cost of repairs would have been well under the legally recognized seventy-five percent total loss threshold. (Compl. ¶¶ 198–99, 203, 206–07.) In particular, Plaintiff alleges Defendants declared one customer's vehicle to be a total loss where the repair estimate was $15,351.50 and the vehicle's total value exceeded $40,000. (Compl. ¶¶ 198–99.) Finally, Plaintiff alleges that Defendants purposely created administrative hurdles and delays in claims processing that increased the overall cost of repairs and made Plaintiff a less attractive repair shop for vehicle owners. (Compl. ¶ 143.)

47. The foregoing demonstrates that material questions of fact remain as to Defendants' motives for interfering and whether Defendants' actions were reasonably related to their interest in having vehicles repaired for the lowest price. Taking as true the allegation that Defendant Pritchard threatened that Farm Bureau *and other*

*insurers* would blacklist Plaintiff if Mr. Bradshaw continued to work there, there is a question as to whether Defendants acted in the interests of Farm Bureau in getting vehicles repaired correctly and for a low price, or alternatively whether they acted out of personal hostility towards Mr. Bradshaw and Plaintiff. Further, a reasonable argument exists for the proposition that declaring vehicles as total losses when such was unnecessary and intentionally delaying the processing of claims and payments served no legitimate business purpose.

48.     Viewing the facts and permissible inferences in the light most favorable to Plaintiff, as the Court must at this stage, the Court concludes that Plaintiff has adequately alleged the elements of both a claim for tortious interference with contract and tortious interference with prospective economic advantage. As a result, judgment on the pleadings as to Plaintiff's tortious interference claim is unwarranted as there are unresolved questions of fact regarding whether Defendants' interference was justified.

B.     **Claims Against Defendant Short**

49.     Defendants argue that the Motion should be granted as to all claims against Defendant Short because there is no factual or legal basis for such claims. (Defs.' Br. Supp. 13.)

50.     The Complaint alleges that Defendant Short, at all relevant times, was a field claim manager for Farm Bureau. (Compl. ¶ 14.) The only allegations specific to Defendant Short are that he mailed two letters to Plaintiff—the January 9th letter and the March 4th letter. (Compl. ¶¶ 40, 43.) The Complaint alleges that prior to

the March 4 letter, Defendants had never objected to Plaintiff's diagnostic analysis and administrative fees. (Compl. ¶ 46.) Then, in June 2015, just three months after Short's letter threatened to do so, Farm Bureau began sending the Uncovered Fees Letter to all claimants considering Plaintiff for repairs. (Compl. ¶ 49.) The only other factual allegation that may be construed as referring directly to Defendant Short is that, "at the direction of Pritchard *and other management personnel*," Farm Bureau began a deliberate campaign to harm Plaintiff "in violation of North Carolina law and public policy against defamation, tortious interference, restraint of trade and steering." (Compl. ¶ 35 (emphasis added).)

### 1. UDTP Claim

51. Under North Carolina's Unfair Trade Practices Act, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a). To establish a claim for UDTP, plaintiff must show that "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). "The Act was intended to benefit consumers, but its protections extend to businesses in appropriate situations." *Id.* (citation omitted).

52. Defendants argue that the UDTP claim against Defendant Short must be dismissed because there is no allegation that he personally committed an unfair or deceptive practice, and, in particular, that Plaintiff has not alleged that Short personally defamed Plaintiff or interfered with Plaintiff's business relations. (Defs.'

Br. Supp. 14.)  However, Defendants fail to address Plaintiff's allegation that "Farm Bureau, at the direction of Pritchard and other management personnel," which necessarily includes Defendant Short, "engaged in a deliberate campaign to cause economic, competitive and reputational harm to [Plaintiff]" in a variety of unlawful ways.  (Compl. ¶ 35.)  A person may be liable for harm to a third person that results from the tortious conduct of another if he "orders or induces the conduct" and knows or should know of the circumstances that make the conduct tortious.  Restatement (Second) of Torts § 877.  Here, Plaintiff alleges that (1) Defendant Short was a field claim manager, (2) management personnel directed a campaign to harm Plaintiff, and (3) Farm Bureau carried out the threat in Short's March 4th letter to inform Plaintiff's current and prospective customers that Farm Bureau would not pay certain fees charged by Plaintiff.  Although sparse on specific details, the Court concludes that the Complaint sufficiently alleges that Defendant Short engaged in unfair or deceptive acts or practices by directing other Farm Bureau employees to engage in conduct that, if proved, may properly form the basis of a UDTP claim.  *See Eli Global, LLC v. Heavner*, 794 S.E.2d 820, 827–28 (N.C. Ct. App. 2016) (reversing dismissal of plaintiff's UDTP claim where plaintiff adequately alleged slander *per se*); *Roane-Barker v. Se. Hosp. Supply Corp.*, 99 N.C. App. 30, 41, 392 S.E.2d 663, 670 (1990) (noting that tortious interference with contract can support a UDTP claim).  As such, Defendant Short's Motion to dismiss this claim is denied.

## 2.    Punitive Damages

53.    Punitive damages are only available if the claimant proves that the defendant is liable for compensatory damages and engaged in fraudulent, malicious, or willful or wanton conduct that related to the injury for which compensatory damages were awarded.  N.C. Gen. Stat. § 1D-15(a).

54.    Defendants contend that in the absence of any viable claim against Defendant Short, the Court should also enter judgment as to Plaintiff's request for punitive damages.  Having concluded that Defendant Short is not entitled to judgment on the pleadings as to Plaintiff's UDTP claim against him, Plaintiff's request for punitive damages against him may proceed.

55.    Therefore, the Motion is denied as to Plaintiff's request for punitive damages as to Defendant Short.

## V.    CONCLUSION

56.    For the foregoing reasons, the Court hereby **DENIES** Defendants' Motion for Judgment on the Pleadings as follows:

A.    The Court **DENIES as moot** the Motion as to Plaintiff's libel *per se* claim and Plaintiff's declaratory judgment action against Defendant Short given Plaintiff's voluntary dismissal of these claims.

B.    The Court **DENIES** the Motion as to Plaintiff's claim for tortious interference with contract and prospective economic advantage.

C.    The Court **DENIES** the Motion as to Plaintiff's UDTP claim against Defendant Short.

D.     The Court **DENIES** the Motion as to Plaintiff's request for punitive

damages as to Defendant Short.

**SO ORDERED**, this the 21st day of November, 2017.


                                        /s/ Michael L. Robinson
                                        _____
                                        Michael L. Robinson
                                        Special Superior Court Judge
                                          for Complex Business Cases